JUDGE SAND

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - x
:
XENTEL, INC. and COURTESY HEALTH     :
WATCH, INC.,                                                 :         Civ
:
Petitioners,         :    VERIFIED PETITION TO
:    CONFIRM ARBITRATION AWARD
-against-                   :
:
UNITED BREAST CANCER FOUNDATION,   :
:
Respondent.          :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - x

**11 CIV 3198**

RECEIVED
MAY 11 2011
U.S.D.C. S.D.N.Y.
CASHIERS

Petitioners, Xentel, Inc. and Courtesy Health Watch, Inc. (hereinafter collectively

"Xentel"), by and through their undersigned counsel, respectfully allege the following in support

of their Verified Petition to Confirm Arbitration Award:

## INTRODUCTION

1.      This Petition is brought pursuant to Section 9 of the Federal Arbitration Act, 9

U.S.C. § 9, to confirm and have judgment entered on an arbitration award dated March 29, 2011

(hereinafter the "Award"). A true and correct copy of the Award is attached hereto as **Exhibit 1**,

and incorporated herein by reference.

2.      The Award was issued in an arbitration that was conducted before the American

Arbitration Association ("AAA") and that is captioned *Xentel, Inc./Courtesy Health Watch, Inc.*

*vs. United Breast Cancer Foundation,* AAA Case No. 13-193-00882-10.

3.      No previous application for the relief sought herein has been made to this Court or

any other court.

7497945v.1

4.      Claimant Xentel and Respondent United Breast Cancer Foundation ("UBCF") entered into an agreement dated August 22, 2005, pursuant to which Xentel was to provide member recruiting and fundraising services to UBCF for a period of five (5) years for a series of fundraising campaigns throughout the continental United States (the "Agreement"). A copy of the Agreement, including Schedules A-D, is annexed hereto as **Exhibit 2**.

5.      The Agreement provides, at section 15 for arbitration, as follows:

> 15.00 ATTORNEY FEES AND BINDING ARBITRATION
>
> 15.01  In the event that there is any dispute concerning the terms and conditions of this Agreement, the parties agree to submit to binding arbitration pursuant to the rules of the American Arbitration Association, and the prevailing party in any arbitration shall be entitled to an award of reasonable attorney's fees and costs. The place of arbitration shall in the counties of Suffolk, Nassau or New York in the state of New York.

6.      On April 12, 2010, Xentel, pursuant to the aforesaid arbitration provision, filed with the AAA a Demand for Arbitration against UBCF, requesting that New York City serve as the locale for the arbitration and that the AAA Arbitration Rules apply.

7.      The Demand for Arbitration alleged in substance that UBCF had failed to make payments to Xentel when due. A copy of the Demand for Arbitration, with exhibit, is attached as **Exhibit 3**, and incorporated herein by reference.

8.      On June 16, 2010, UBCF filed an Answering Statement with Affirmative Defenses and Counterclaim with the AAA, denying UBCF's allegations that Xentel had failed to comply with the terms of the Agreement. The Counterclaim also sought damages from Xentel for failure by Xentel to provide certain credits to UBCF. A copy of the Answering Statement with Affirmative Defenses and Counterclaim is attached as **Exhibit 4**, and incorporated herein by reference.

-2-

9.      In accordance with the AAA Rules and the Agreement, a one-person Panel (hereinafter "the Panel") was formed and accepted by the parties without objection. The Panel-member was Charles Moxley, Jr., Esq. A copy of the AAA Rules is attached as **Exhibit 5**, and incorporated by reference.

10.     Upon UBCF's repeated requests, proceedings were time and again postponed due to an injury suffered by UBCF's key witness, but finally a hearing was held over two days, on February 8 and 9, 2011, at the offices of Xentel's counsel in New York City, to which location counsel for UBCF consented. A total of five (5) witnesses testified during the hearing.

11.     Thereafter, the Panel issued the Interim Award on March 29, 2011, finding for Xentel and against UBCF on all claims. The Interim Award provides, in relevant part, as follows:

(1)     Within thirty days of the date of this Interim Award, Respondent United Breast Cancer Foundation shall pay Claimant Courtesy Health Watch, Inc. the sum of $112,976.71, along with pre-award interest in the amount of $35,461.45, for a total payment in the amount of ONE HUNDRED FORTY-EIGHT THOUSAND FOUR HUNDRED THIRTY-EIGHT DOLLARS AND SIXTEEN CENTS ($148,438.16).

(2)     Within thirty days of the date of this Award, Respondent United Breast Cancer Foundation shall further pay Claimant Courtesy Health Watch, Inc. the sum of THIRTY-FOUR THOUSAND TWO HUNDRED THIRTY-NINE DOLLARS AND NO CENTS ($34,239.00).

(3)     The counterclaims of Respondent United Breast Cancer Foundation are dismissed with prejudice.

(4)     It is hereby declared that Claimant Courtesy Health Watch, Inc. is the prevailing party in this arbitration and, as such, is entitled, under the Parties' above-referenced arbitration agreement, to an award of reasonable attorneys' fees and costs in this matter.

(5)     Pursuant to the previously-established schedule, Claimant Courtesy Health Watch, Inc, shall have two weeks from its receipt of this Interim Award to serve and file affidavits and exhibits as to its attorneys' fees and costs in this matter, following which Respondent United Breast Cancer Foundation shall have one week to serve and file opposing papers as to attorneys' fees and costs or to request that a hearing be scheduled as to such matters.

7497945v.1

    (6)    Except as otherwise expressly set forth herein, this INTERIM AWARD is in full settlement of all claims, counterclaims, and set-offs submitted to this arbitration. All other claims, counterclaims, and set-offs not expressly granted herein are hereby denied.

*See* **Exhibit 1**.

12.    The Interim Award is titled "Interim" because the parties had agreed to file submissions on the award of attorney's fees only if it became necessary to do so based upon the findings of the Panel. Based upon the Interim Award, it did in fact become necessary to do so, and that is still pending. The Interim Award expressly provides on its face that, except for the issue of the measure of attorney's fees to be awarded, it is final in all respects. ("6. Except as otherwise expressly set forth herein, this INTERIM AWARD is in full settlement of all claims, counterclaims, and set-offs submitted to this arbitration. All other claims, counterclaims, and set-offs not expressly granted herein are hereby denied.")

## PARTIES

13.    Xentel, Inc. is a Delaware company, with its executive offices in Ft. Lauderdale Florida. Xentel is in the businesses of, among other things, donor relationship enhancement and fundraising for non-profit institutions.

14.    Courtesy Health Watch, Inc. is a Delaware company. Courtesy Health Watch is in the businesses of, among other things, donor relationship enhancement and fundraising for non-profit institutions.

15.    UBCF is a New York non-profit corporation, that upon information and belief, maintains its principal place of business in Huntington, New York.

## JURISDICTION AND VENUE

16.    Diversity of citizenship exists between Petitioner, a Delaware entity, and Respondent, a New York entity.

-4-

17.     The amount in controversy in this action exceeds One Hundred Thousand ($100,000) Dollars.

18.     Accordingly, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

19.     Venue is proper in this jurisdiction because the subject arbitration took place in this District, in the County and State of New York.

### STATEMENT OF FACTS

20.     Petitioner Xentel and Respondent UBC entered into an agreement dated August 22, 2005, pursuant to which Xentel was to provide member recruiting and fundraising services to UBC for a period of five (5) years for a series of fundraising campaigns throughout the continental United States (the "Agreement").

21.     The Agreement governed the terms and conditions by which Xentel provided services to UBCF.  Billing disputes arose between the parties.  When the parties were unable to resolve the disputes,  Xentel filed its demand for arbitration.

### AWARD OF THE PANEL

22.     On March 29, 2011, after considering all of the evidence, allegations and arguments submitted by the parties, the Panel issued its signed and affirmed Award.  A copy of the Award is attached as **Exhibit 1**, and incorporated herein by reference.

23.     The Panel found for Xentel on all of its claims and against UBCF on all of its counterclaims, and awarded the following relief:

> (1)     Within thirty days of the date of this Interim Award, Respondent United Breast Cancer Foundation shall pay Claimant Courtesy Health Watch, Inc. the sum of $112,976.71, along with pre-award interest in the amount of $35,461.45, for a total payment in the amount of ONE HUNDRED FORTY-EIGHT THOUSAND FOUR HUNDRED THIRTY-EIGHT DOLLARS AND SIXTEEN CENTS ($148,438.16).

7497945v.1

(2) Within thirty days of the date of this Award, Respondent United Breast Cancer Foundation shall further pay Claimant Courtesy Health Watch, Inc. the sum of THIRTY-FOUR THOUSAND TWO HUNDRED THIRTY-NINE DOLLARS AND NO CENTS ($34,239.00).

(4) It is hereby declared that Claimant Courtesy Health Watch, Inc. is the prevailing party in this arbitration and, as such, is entitled, under the Parties' above-referenced arbitration agreement, to an award of reasonable attorneys' fees and costs in this matter.

(5) Pursuant to the previously-established schedule, Claimant Courtesy Health Watch, Inc, shall have two weeks from its receipt of this Interim Award to serve and file affidavits and exhibits as to its attorneys' fees and costs in this matter, following which Respondent United Breast Cancer Foundation shall have one week to serve and file opposing papers as to attorneys' fees and costs or to request that a hearing be scheduled as to such matters.

*Id.* at ¶¶ 1-2, 4-5.

24. The Award was delivered to Xentel and UBCF on March 29, 2011. Therefore, this Petition to Confirm Arbitration Award has been brought within the one-year period prescribed by the Federal Arbitration Act (the "FAA").

## THE AWARD OF THE PANEL SHOULD BE CONFIRMED

25. The FAA applies because the award arises out of a contract that involved interstate commerce.

26. Under Section 9 of the FAA, a court of competent jurisdiction "must" grant an order conforming an arbitration award "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of" the FAA.

27. In connection with the dispute between Xentel and UBCF, and after a 2-day hearing, the Panel issued the award in Xentel's favor. UBCF has not made an application to the Panel, or any Court, to vacate, modify, or correct the Award. The time to file a request for modification to the AAA or the Panel has expired. Moreover, none of the grounds for vacating, modifying, or correcting the Award exist.

-6-

7497945v.1

28.     As of May 6, 2011, UBCF has not paid any portion of the Award to Xentel.

29.     Accordingly, and as explained more fully in the accompanying Memorandum of Law, the Petition by Xentel to confirm the arbitration award should be granted in its entirety, and the Award should be confirmed pursuant to Section 9 of the FAA, 9 U.S.C. § 9.

**CONCLUSION**

WHEREFORE, for the reasons stated herein, and as more fully explained in the accompanying Memorandum of Law, Xentel respectfully requests that this Court enter an Order confirming the March 29, 2011 Award and directing that judgment be entered thereon against United Breast Cancer Foundation in the United States District Court for the Southern District of New York, that Xentel be awarded prejudgment interest on the award from the date of the award until judgment enters, and that Xentel be allowed its costs and fees (pursuant to the terms of the Agreement), costs, and disbursements in connection with this proceeding.

Dated: New York, New York
       May 9, 2011

Respectfully submitted,
**WHITE AND WILLIAMS LLP**

By:_____
     Randy M. Friedberg, Esq.
     One Penn Plaza, Suite 4110
     New York, NY 10119
     Phone: 212-244-9500
     Fax:  212-631-4426
     *Attorneys for Plaintiff*
     *Xentel, Inc./Courtesy Health Watch, Inc.*

7497945v.1

## VERIFICATION OF XENTEL, INC.

I, *PR Piestikka*, an *Assistant Secty,* of Xentel, Inc.,

verify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the above Verified Petition to

Confirm Arbitration Award is true and correct.

Executed on: May 9, 2011

## VERIFICATION OF COURTESY HEALTH WATCH, INC.

I, *D.R. Piestikka*, an *Assistant Secty* of Courtesy

Health Watch, Inc., verify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the above

Verified Petition to Confirm Arbitration Award is true and correct.

Executed on: May 9, 2011

7497945v.1

1

## Friedberg, Randy

| | |
|---|---|
| **From:** | AAA Karen Fontaine [karenfontaine@adr.org] |
| **Sent:** | Tuesday, March 29, 2011 4:33 PM |
| **To:** | Friedberg, Randy; PoliLaw11769@aol.com |
| **Subject:** | 13 193 00882 10 Courtesy Health Watch Inc v United Breast Cancer Foundation |
| **Attachments:** | Interim Award of Arbitrator 03 29 11.pdf |

Dear Counsel;

Attached please find the Interim Award of the Arbitrator.

Please do not hesitate to contact me should you have questions or concerns.

Many thanks,
sd

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

**Karen Fontaine - Manager of ADR Services**
950 Warren Ave.
Providence, RI 02914-1414
Tel: 401 431 4798
Fax: 401 435 6529
E-mail: karenfontaine@adr.org
www.adr.org

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

---

In the Matter of the Arbitration between

      13 193 00882 10
      Courtesy Health Watch, Inc.
      and
      United Breast Cancer Foundation

---

## INTERIM AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been duly designated in accordance with the arbitration agreement entered into between the above-named Parties dated August 22, 2005, and having been duly sworn, and having duly reviewed the proofs and allegations presented by Claimant Courtesy Health Watch, Inc. and Respondent United Breast Cancer Foundation, do hereby issue this INTERIM AWARD as follows:

1.     Within thirty days of the date of this Interim Award, Respondent United Breast Cancer Foundation shall pay Claimant Courtesy Health Watch, Inc. the sum of $112,976.71, along with pre-award interest in the amount of $35,461.45, for a total payment in the amount of ONE HUNDRED FORTY-EIGHT THOUSAND FOUR HUNDRED THIRTY-EIGHT DOLLARS AND SIXTEEN CENTS ($148,438.16).

2.     Within thirty days of the date of this Award, Respondent United Breast Cancer Foundation shall further pay Claimant Courtesy Health Watch, Inc. the sum of THIRTY-FOUR THOUSAND TWO HUNDRED THIRTY-NINE DOLLARS AND NO CENTS ($34,239.00).

3.     The counterclaims of Respondent United Breast Cancer Foundation are dismissed with prejudice.

4.     It is hereby declared that Claimant Courtesy Health Watch, Inc. is the prevailing party in this arbitration and, as such, is entitled, under the Parties' above-referenced arbitration agreement, to an award of reasonable attorneys' fees and costs in this matter.

5.     Pursuant to the previously-established schedule, Claimant Courtesy Health Watch, Inc. shall have two weeks from its receipt of this Interim Award to serve and file affidavits and exhibits as to its attorneys' fees and costs in this matter, following which Respondent United Breast Cancer Foundation shall have one week to serve and file opposing papers as to attorneys' fees and costs or to request that a hearing be scheduled as to such matters.

13 193 00882 10
Courtesy Health Watch, Inc.
and
United Breast Cancer Foundation


      6.     Except as otherwise expressly set forth herein, this INTERIM AWARD is in full settlement of all claims, counterclaims, and set-offs submitted to this arbitration. All other claims, counterclaims, and set-offs not expressly granted herein are hereby denied.


_3/29/11_ _____
Date

_Charles J. Moxley_ _____
Charles J. Moxley, Jr.


I, Charles J. Moxley, Jr., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed the foregoing instrument, which is my INTERIM AWARD.

_3/29/11_ _____
Date

_Charles J. Moxley_ _____
Charles J. Moxley, Jr.

2

**THIS AGREEMENT SIGNED THIS 22ND DAY OF AUGUST, 2005**

BETWEEN:

**XENTEL , INC**
a Delaware Corporation with offices at
101 NE 3rd Avenue, Suite 203
Ft. Lauderdale, FL
33301                                      ("Consultant")

- and -

**UNITED BREAST CANCER FOUNDATION**
An IRS 501 (c)(3) registered charitable organization with offices at
223 Wall Street, Suite 368
Huntington, NY
11743

("Client")

RECITALS:

1.      Consultant is registered where required as a professional solicitor/fundraiser pursuant to state laws, and has all necessary licenses and permits and full power and authority to carry on its business as contemplated by this agreement.  Consultant has full legal right, power and authority to enter into this Agreement and to undertake the actions to be performed under this Agreement.

2.      Client is a not for profit corporation duly organized, validly existing and in good standing pursuant of the laws of the State of New York.  Client has full legal right, power and authority to enter into this Agreement.  Client is an organization that is exempt from federal income tax under Section 501 (C) (3) of the Internal Revenue Code of 1986, as amended (the "Code").

3.      Client wishes to engage the services of Consultant on the terms set out in this Agreement to conduct an annual multi-phase "BeneCall™" campaign (the "Campaign") comprised of a sixty (60) month term beginning October 1, 2005 and ending September 30, 2010.

THIS AGREEMENT WITNESSES:

1.00    CONSULTANT'S OBLIGATIONS

1.01    Client engages the services of Consultant and Consultant agrees to:

        (1)     Develop and implement a marketing program for the Campaign for Client by means of telephone canvass with direct mail follow up for fulfillment purposes;

┌─────────────────────┐
│ **Contract #: 3877**    │
│                     │
└─────────────────────┘

  (2)  Manage the marketing, collection, reporting and deposit of monies received on behalf of Client;

  (3)  Provide as much Campaign time as possible up to the maximum stipulated in Schedule "A", as long as the Line Hour pledge rate is economically viable, and promptly advise Client should the said pledge rate not be viable.

1.02  In order to fulfill its obligations under this Agreement Consultant will, at its sole cost:

  (1)  Maintain a staff sufficient to conduct promotion and marketing of the Campaign;

  (2)  Maintain office space, furnishings, office equipment, secretarial services, and telephones and phone services sufficient to conduct the Campaign;

  (3)  Arrange for and produce, subject always to Client's prior review and approval, all necessary printed materials including, but not limited to: pledge forms, fulfillment packages, envelopes, order forms (the "Advertising Materials") and other materials necessary for the success of the Campaign;

  (4)  Arrange for and complete the mailing of all Campaign associated materials, provided that the Consultant shall not pay the costs of any newsletter distribution by Client other than those prescribed for the Campaign nor shall Consultant pay for postage or costs of printed materials associated with mailing receipts to donors; and

  (5)  Pay when due expenses incurred in the performance of its obligations under this Agreement.

1.03  At all times, Consultant shall abide by all applicable Federal, State or municipal laws or regulations pertaining to direct marketing and fund-raising practices, as well as to applicable industry codes of ethics.

1.04  Client and Consultant recognize the Campaign will generate some inquiries and even complaints from consumers. Consultant will respond in a professional and courteous manner to any complaint raised by consumers in relation to the Campaign and will do its best to resolve any complaint to the consumer's satisfaction. Consultant will provide Client pre-printed customer inquiry forms for documentation of inquiries pertaining to the Campaign received by Client. Client will then complete and fax these forms to the Consultant for action.

## 2.00  PERMITS, CONSENTS AND TAXES

2.01  All necessary permits, consents, licenses, clearances or other permissions that may be required by any validly constituted governmental authority for the Campaign will be obtained by and at the expense of Client with the assistance of Consultant. **CLIENT MAY BE REQUIRED TO REGISTER WITH THE STATE(S) IN WHICH CAMPAIGN OPERATES. THIS SHALL BE THE SOLE RESPONSIBILITY OF CLIENT.**

2.02  Failure of Client to obtain said permits in a timely fashion after reasonable notice received from Consultant may result in termination of this Agreement, at sole discretion of

Consultant.  In this event Client will be liable for and shall forthwith reimburse Consultant for all reasonable expenses incurred up to and including date of such termination.

2.03    Consultant agrees that should it be incumbent on Client to collect and remit any federal, state or other sales tax on the sale of products or services to the general public, such products or services being delivered by Consultant on behalf of Client, then Consultant shall do so and remit said taxes to Client for conveyance to the appropriate authorities.  Provided Consultant fulfills its obligations under this paragraph, liability for collection and remittance of said taxes rests solely with Client.

## 3.00    DEFINITIONS

3.01    In this Agreement:
   (1)    "Lists" mean:

   a)    lists of supporters of previous campaigns managed by Consultant on behalf of Client;

   b)    list of people who have not supported previous campaigns managed by Consultant on behalf of Client but who have supported other projects managed by Consultant;

   c)    lists of persons who have not supported any of Consultant's clients;

   d)    any other form of information relating to purchasers of advertising or tickets, or supporters of projects managed on behalf of any of Consultant's clients not already included in the definition of Lists;

   e)    but excludes any such lists already in possession of Client prior to the effective date of this Agreement.

   (2)    "Donor List" is a list in electronic form of paid contributors to the Campaign;

   (3)    "Confidential Information" means any information designated in writing by Client or Consultant as confidential;

   (4)    "Line Hour" means one telephone canvasser assigned to the Campaign working at one workstation for one hour with provision for break periods specified in applicable employment standards legislation;

   (5)    "Membership Recruitment" means seeking and securing new members for the Client;

   (6)    "Donor Acquisition" means seeking and securing donation from new supporters for the Client;

   (7)    "Donor Retention" means seeking and obtaining donations from Client's current and past members and/or donors;

(8)   "Economically Viable Pledge Rate" means in any one phase of the Campaign at least $55.00 pledged per line hour on either Donor Acquisition or Membership Recruitment, and at least $130.00 pledged per line hour on Donor Retention;

(9)   "Campaign Phase" means specifically Membership Recruitment, Donor Acquisition or Donor Retention activities conducted within any of the three (3) twelve month Campaign Periods, and all Gross Receipts associated therewith, even if accrued after completion of the Campaign Phase;

(10)   "Segment" is a distinct Donor retention marketing initiative conducted within a given twelve month Campaign Period.

## 4.00   DONOR LISTS AND CONFIDENTIAL INFORMATION

4.01   Client agrees that, except as provided herein, Lists or other Confidential Information which Consultant owns prior to the commencement of this Agreement or develops during the term of this Agreement are exclusive property of Consultant and may not be utilized, in whole or in part, in any way by Client without the express prior written consent of Consultant. Consultant agrees that Lists or other Confidential Information which Client owns prior to the commencement of this Agreement or develops during the term of this Agreement, are exclusive property of Client and may not be utilized in whole or in part in any way by Consultant without the express prior written consent of Client.

4.02   Each party's Lists and Confidential Information shared with the other party will be kept in strictest confidence and will not be duplicated, copied, reproduced or otherwise retained by the recipient party, nor used in any other manner without the express prior written consent of the originating party.

4.03   Provided that Client has met its financial obligations under this Agreement and any schedules, addenda or written amendments hereto, Consultant shall prepare and deliver in electronic form to Client on a weekly basis the list of donors to the Campaign (the "Donor List"). The Donor List is the property of Client and will not be used by Consultant for any other purpose. Client recognizes and agrees that Consultant may update its lists and databases with transactional information derived from the Campaign.

4.04   Client may, from time to time during the Campaign, provide Consultant with a "Do Not Call" list, and Consultant shall refrain from contacting any donor or potential donor named on such list or lists during the Campaign. Client shall, at all times, be permitted to solicit or continue to solicit any donor or potential donor named on any such list. The scope of the Do Not Call list shall in no event be such that it will unduly limit Consultant's ability to meet its responsibilities under this Agreement.

## 5.00   BANK ACCOUNT

5.01   All monies in the form of checks, money orders, bank drafts or cash received by Consultant on Client's behalf pursuant to this Agreement (the "Gross Receipts") will be segmented by Campaign Phase and Segment and directly deposited, within two (2) days of receipt, into a checking account in the name of Client at a Chase Bank branch located in Milwaukee (the "Bank Account") within two days of receipt, not including Saturdays and holidays. The Bank Account will be used solely for the purposes of the Campaign. Client will

have sole control of the Bank Account and will be the sole signing authority on the Bank Account.

5.02    Consultant may also collect monies on Client's behalf by means of accepting credit card payments by phone. Credit card payments will be deposited to Consultant's merchant banking account(s) in trust for the Client, and will be transferred, in their entirety, to Client's bank account within 2 business days of receipt.

5.03    Client and Consultant agree that all monies deposited into the Bank Account will be for Client's sole use.

## 6.00    INSURANCE AND BONDING

6.01    Throughout the term of this Agreement, Consultant shall obtain and maintain at its sole cost and expense for itself and for its employees and agents, policies of insurance or bonds by which contributions to the Campaign will be protected against any loss occasioned by the neglect or dishonesty of Consultant, its employees or agents.

6.02    Consultant warrants that it will post and maintain in good standing such bonds as may be required by regulators in the jurisdiction(s) in which the Campaign is conducted.

## 7.00    FINANCIAL OBLIGATIONS

7.01    In consideration of Consultant performing its obligations under this Agreement, Client will pay Consultant as provided for in Schedule "A".

7.02    Every Friday during the term of this Agreement, or on such other day agreed upon by the parties considering Client's book-keeping schedule, Consultant will invoice Client for services rendered for each phase of the Campaign.

7.03    Client agrees to pay all Consultant's invoices within ten (10) days from date of invoice, by means of Electronic Funds Transfer where available, otherwise by check. Invoices will not be presented unless sufficient Gross Receipts have been deposited to Client's account. Interest will be charged at a rate of 2.0% per month (effective rate 24% per annum) on all overdue invoices.

7.04    Client agrees that should it, without valid reason, fail to pay Consultant's invoices within thirty (30) days of invoice, the Consultant may at its sole discretion, and the Client hereby specifically authorizes the Consultant to so do, appoint a qualified third party as trustee of the Bank Account disbursing the funds therein, in strict accordance with the terms of this Agreement.

## 8.00    REPORTING

8.01    Together with the delivery of its invoices for services rendered, Consultant shall, at its sole cost and expense, provide to Client for each Campaign Phase or Segment a report of all Gross Receipts processed by Consultant during the billing period just ended, together with proof of deposit slips indicating the direct deposit into the Bank Account.

8.02    Consultant agrees to provide weekly activity reports, segmented by Campaign Phase or Segment, to Client on a regular basis indicating:

- dollar value of pledges, weekly and cumulative
- pledges paid, weekly and cumulative
- number of pledges, weekly and cumulative
- number of line hours used, weekly and cumulative
- number of line hours billed to Client, weekly and cumulative

**9.00   RELATIONSHIP OF PARTIES**

9.01    Consultant agrees that it will not contract in the name of Client and that it will not, in any manner, bind or purport to bind Client to any obligation, charge or payment without having first received, in writing, the consent of Client to be so bound.

9.02    Neither this Agreement nor any activities of Client or Consultant contemplated by this Agreement constitutes a joint venture, partnership or any other relationship between the parties other than that of Client and Consultant.

**10.00   SIMILAR EVENTS AND RIGHT OF FIRST REFUSAL**

10.01   Client agrees that it will not schedule any campaign similar to or the same as that contemplated by this Agreement within the areas specified in Schedule "A" within the 90 day period prior to the commencement date of, nor during, the Campaign.

10.02   Parties acknowledge that Consultant currently is contracted by the following cancer related organizations:

- National Cancer Coalition, New Orleans, LA

- Cancer Recovery Foundation of America, Harrisburg, PA

10.03   Subject to satisfactory compliance by Consultant with the terms and conditions of this Agreement, Client will offer, on the terms hereinafter set out, right of first refusal to Consultant should Client wish to:

    (1)    utilize the services of a professional marketing organization during the twelve months following the end of the term of this Agreement; or

    (2)    repeat the Campaign in the twelve months following the term of this Agreement.

10.04   Client agrees that, in accordance with Paragraph 10.02, if Client wishes to secure competing bids for Consultant's services, Client will present to Consultant a bona fide copy of the bid which Client wishes to accept. Consultant shall have five (5) business days from the date of receiving the bid to respond. If Consultant wishes to meet all terms and conditions of the competing bid, Consultant shall be granted the contract on the identical terms and conditions of the competing bid, except as may be otherwise mutually agreed by Client and Consultant. In the event Consultant does not wish to meet the terms and conditions of the competing bid, it shall advise Client in writing within such 5 business day period and Client shall then be free to contract with any service provider it wishes.

**11.00   TELEPHONE SCRIPT, ADVERTISING MATERIAL, RECORDING & DISCLOSURE**

**11.01**   Consultant will provide to Client for Client's approval all scripts (the "Script") and advertising material (the "Advertising Material") to be used by Consultant in the Campaign. The Script and Advertising Material shall not be used by Consultant until it is in a form approved by Client, and will not be amended without the prior, written approval of Client.

**11.02**   Client's representatives are welcome at Consultant's offices anytime during the Campaign in order to satisfy themselves that the approved Script is being substantially and faithfully followed.

**11.03**   Consultant agrees to exercise supervision to ensure strict compliance by its staff, agents, employees and subcontractors with the approved Script.

**11.04**   Consultant will abide by each applicable jurisdiction's laws pertaining to monitoring or recording of its employees' conversations with consumers.  Consultant will make copies of all recordings available to Client for its review.

**11.05**   Consultant will abide by each applicable jurisdiction's laws pertaining to disclosure of Campaign information and Client will assist Consultant by, in a timely way, providing, filing as required, and making public such financial or other information for the Campaign or its other activities as may be required by all applicable laws, rules and regulations.

**11.06**   Client acknowledges that Consultant is relying upon information provided to it by the Client for the conduct of the Campaign and compliance with laws of various jurisdictions. Client warrants that information it provides to Consultant is accurate, truthful and up-to-date, and Client assumes all responsibility for and indemnifies Consultant for any action resulting from Consultant's use of such information subject to 11.01 through 11.06 of this Agreement.

**12.00   ASSIGNMENT OF AGREEMENT**

**12.01**   Consultant may not assign this Agreement or any portion thereof to a bona fide third party contractor unless:

1) Client provides its prior written consent;
2) Such third party provides such undertakings and assurances as required by the Agreement;
3) Such assignment or subcontract incorporates all of the terms contained in this Agreement.

**13.00   NOTICES**

**13.01**   All notices, demands or statements provided for in this Agreement and any other notices which may be deemed necessary shall be in writing and delivered personally or forwarded by certified mail to the following address, or addresses as may be designated by either of the parties in accordance with the provisions of this section.

13.02   Notices will be deemed to have been received or made upon the day upon which notice is personally delivered or, if posted via Certified Mail, then on the fourth business day following the date of mailing:

|  | | |
|---|---|---|
| (1) | to Client at: | **UNITED BREAST CANCER FOUNDATION** 223 Wall Street, Suite 368 Huntington, NY  11743 |

Attention: Stephanie Mastroianni
Telephone No.: (877) UBC-4CURE

With a copy to:                    **Capell Vishnick LLP**
3000 Marcus Avenue, Suite 1E9
Lake Success, NY  11042

Attention: Christopher McDonald

(1)      to Consultant at:         **XENTEL, INC.**
203, 101 NE 3rd Avenue
Ft. Lauderdale, FL  33301

Attention: Michael Platz
Telephone No.: (954) 522-5200

## 14.00   INDEMNITIES

14.01   Consultant agrees to and does hereby indemnify Client against all claims, losses, liabilities, costs and expenses, which may be incurred by Client as a result of any breach of this Agreement by Consultant, its employees or its agents.

14.02   Client agrees to and does hereby indemnify Consultant against all claims, losses, liabilities, costs and expenses, which may be incurred by Consultant as a result of any breach of this Agreement by Client, it employees or its agents.

## 15.00   ATTORNEY FEES AND BINDING ARBITRATION

15.01    In the event that there is any dispute concerning the terms and conditions of this Agreement, the parties agree to submit to binding arbitration pursuant to the rules of the American Arbitration Association and the prevailing party in any arbitration shall be entitled to an award of reasonable attorney's fees and costs.  The place of arbitration shall be in the counties of Suffolk, Nassau or New York in the state of New York.

## 16.00   LEGAL ADVICE

16.01   The client confirms that Consultant has recommended Client obtain qualified independent legal advice prior to signing this Agreement.

**17.00   INTERPRETATION**

**17.01**   Should part of this Agreement be or become illegal or unenforceable, that part will be considered severable from this Agreement and the remainder of this Agreement will remain in effect as though the illegal or unenforceable parts had not been included.

**17.02**   All provisions of this Agreement are to be construed as covenants and Agreements as though the words imparting covenants and Agreements were used in each case.

**17.03**   Wherever the singular number or gender are used in this Agreement, it will be construed to include the plural, masculine, feminine or neuter, respectively, as the context requires.

**18.00   ENUREMENT**

**18.01**   This Agreement ensures to the benefit of and binds the successors and assigns of the parties.

**19.00   FURTHER ASSURANCES**

**19.01**   The parties agree to do all acts, including the execution of all documents, as may be necessary to fulfill this Agreement.

**20.00   TIME**

**20.01**   Time is of the essence of this Agreement.

**21.00   AMENDMENT**

**21.01**   This Agreement shall not be amended unless agreed to in writing by the parties.

**22.00   TERM OF AGREEMENT**

**22.01**   This Agreement shall remain in force for sixty (60) months from October 1, 2005, through September 30, 2010. However, provisions relating to Financial and Accounting Obligations, Similar Events, Lists and Confidential Information contained in this Agreement shall survive the expiry or early termination of this Agreement.

**23.00   EARLY TERMINATION**

**23.01**   Client reserves the right to amend or revoke this Agreement in the event of administrative, judicial or other governmental findings, inconsistent with the reporting of Client as a result of the Agreement as follows:

    (a)   Client shall provide Consultant written notice of its intent sixty (60) days before the effective date of such amendment or revocation, which period shall begin on the date of mailing. If Client chooses to amend the Agreement, said amendment must be acceptable to Consultant.

(b)     Should any annual campaign be commenced before the sixty (60) day notice, this Agreement, as written, shall remain in effect until there has been full contract performances necessary for completion of such campaign, including payment of all invoices.

23.02   Consultant and Client may terminate this Agreement at either's discretion within ninety (90) days written notice, except as follows:

(i)     both parties agree to a shorter termination period; or
(ii)    if this Agreement survives to its first anniversary then neither party may exercise this termination clause for the balance of the term except in the case of negligence in breach of the terms of this Agreement by the other party.  Notwithstanding the foregoing, Consultant will immediately cease and desist all fundraising activities on receipt of such notice if the termination results from a breach by Consultant of this Agreement or an unreasonable amount of complaints or negative publicity as a result of the campaign.

23.03   Provisions relating to Financial and Accounting Obligations, Similar Events, Lists and Confidential Information contained in this Agreement shall survive termination of this Agreement.

**24.00 DEADLINE DATE**

24.01   Until signed, this contract constitutes an offer to provide services. In order for Consultant to properly license this Agreement and execute it's responsibilities in a timely manner this offer must be accepted and returned by September 1, 2005. In the event that such acceptance is not forthcoming by this date, then Consultant reserves the right to withdraw this offer.

**25.00 CAUTION TO ALL CLIENTS**

25.01   Consultant advises Client that while fund-raising by telephone canvassing has generally proven to be a reliable method of securing net income, it should never become the Client's sole means of income generation. Client is strongly encouraged to use telephone canvassing only as one of several methods of securing donations and only as a part of an integrated marketing and fund-raising program. Client is cautioned that failure to do so could result in unacceptably high overhead cost ratios for fund-raising and may result in negative consequences for the Client in its relationship with donors or government agencies.

25.02   Client acknowledges and accepts that results achieved from telephone fund-raising programs may be negatively affected by factors beyond the control of either Client or Consultant. These factors include but are not limited to: changes in applicable government legislation and regulations; changes in call centre technology required to meet changes in legislation and regulations; major news events covered in the media; media coverage of Client's cause or operations; actions taken by government bodies or the media in opposition to Client's interests; postal strikes; interruptions of electrical power, telephone or other essential services; and Acts of Nature. Consultant accepts no liability for any negative consequences to Client's campaign results which are caused by the above and similar factors.

25.03   During the planning and discussions related to a campaign Consultant or independent consultants representing Consultant may offer financial projections which are believed in good faith to be achievable for Client. Any such projections are for discussion and planning purposes only and do not form part of this Agreement.

**26.0   CHARITABLE PURPOSE**

United Breast Cancer Foundation is dedicated to:

❖   Offering emotional and spiritual support to those battling breast cancer as well as their family members and friends.

❖   Financially supporting institutions whose aim is the prevention, the treatment and the eradication of breast cancer.

❖   Educating the public with regards to the cancer-causing aspects of diet, environmental toxins and genetic disposition.

❖   Offers support in the way of peace of mind and spiritual well being to all of those afflicted and affected by breast cancer.


**IN WITNESS WHEREOF** the parties attest that they have the power and authority to bind and have executed this Agreement this 24 day of August, 2005.

**XENTEL, INC**

**UNITED BREAST CANCER FOUNDATION**

Per: _____
David Winograd, President

Date: 8-29-05

Per: _____
Stephanie Mastroianni
Title: President
Date: 8/24/05

Per: _____
Name: MARY E. HEIN
Title: Secretary
Date: 1/6/05

Notary public

MARIO SZCZUROWSKI
Notary Public, State of New York
No. 01SZ6110350
Qualified in Suffolk County
Commission Expires May 24, 2008

SCHEDULE "A" attached to and forming part of an Agreement dated
August 22, 2005, between
Xentel, Inc. ("Consultant") and
United Breast Cancer Foundation ("Client")

**1.00   CAMPAIGN AREAS**

1.01   The Campaign may be conducted throughout the continental United States.

**2.00   FEES**

2.01   Client agrees to pay Consultant as follows, plus applicable taxes:

| | |
|---|---|
| (1) Membership or Acquisition: | $16.25 per Line Hour for Program Promotion, |
| | $18.75 per Line Hour for Support Development, |
| | $ 7.50 per Line Hour Printing, Postage, Processing |
| |      for a total of: |
| | $42.50 per Line Hour up to a maximum of _____ |
| |      Line Hours per Campaign Period, and |
| (2) Donor Retention: | $16.25  per Line Hour for Program Promotion, |
| | $18.75  per Line Hour for Support Development, |
| | $ 3.00  per Line Hour for Retention Reminders |
| | $20.00 per Line Hour Printing, Postage, Processing |
| |      for a total of |
| | $58.00 per Line Hour up to a maximum of _____ |
| |      Line Hours per Campaign Period. |

2.02   Client and Consultant agree that should Consultant's billings be greater than Gross Receipts of any Campaign Period, Consultant will discount its billings including applicable sales taxes to an amount equal to the Gross Receipts, thereby assuring Client of no possible loss.

**3.00   LIMITATION OF LIABILITY**

3.01   The guarantee as set out in paragraph 2.03 herein, is contingent upon the continued cooperation of Client and shall be subject to re-negotiation in the event of the following:

(a)   Either party shall become the subject of adverse media publicity that results in a significant demonstrable reduction in pledges and/or donations;

(b)   A regulatory body publicly releases a decision in an adjudicated case that a violation has occurred in the conduct of the campaign that results in a significant reduction in pledges and/or donations;

(c)   The occurrence of an unforeseen event such as but not limited to a labor strike, natural disaster, act of war or terrorism, or any other cause beyond Consultant's control that results in a significant demonstrable reduction pledges and/or donations;

(d)   Any law, regulation or licensing provision shall be modified as to materially affect the conduct of business as contemplated herein.

## 4.00  DISCLAIMER

**4.01**    Notwithstanding any other documents, discussions, or any other communication, Client and Consultant agree Consultant works on the Campaign on a best efforts basis. Client and Consultant agree that it is not a condition of this Agreement that Consultant meet any specified goals. However, Client and Consultant will actively review Campaign results together and discuss Campaign progress.


**XENTEL, INC.**

Per:  _____

Dave Winograd, President

Date: __8-29-05__


**UNITED BREAST CANCER FOUNDATION**

Per:  _____

Stephanie Mastroianni

Title: __President__

Date: __8/24/05__

Per:  __Mary E. Hem__

Name: __MARY E. HEIM__

Title: __Secretary__

Date: __9/2/05__

MARC SZCZUROWSKI
Notary Public, State of New York
No. 01SZ6116359
Qualified in Suffolk County
Commission Expires May 24, 2008

SCHEDULE "B" attached to and forming part of an Agreement dated
August 22, 2005, between
Xentel, Inc. ("Consultant") and
United Breast Cancer Foundation ("Client")

1.0     If any provision of this Rider conflicts with any printed provision of this Agreement, the
        provisions of this Rider will control.

2.0     A.   Notwithstanding anything contained in this Agreement to the contrary, Consultant
        hereby guarantees that Client will receive no less than 20% of the aggregate Gross Receipts
        raised by Consultant on behalf of Client during the full five year term of this Agreement. If
        at the expiration of the Agreement, Client has not received at least 20% of the total Gross
        Receipts raised by Consultant on behalf of Client during the Agreement term, Consultant
        will immediately remit to Client a sum equal to the difference between 20% of Gross
        Receipts and those funds received by Client.

        B.   Modifying Paragraph 2.01 (2) of Schedule A to this Agreement, Consultant agrees that
        for each Line Hour of Donor Retention in excess of 2,000 Line Hours per year will be billed
        to Client at the reduced rate of $48.00 per Line Hour.

        C.   Consultant agrees to advance to Client the sum of $90,000 in the form of a non-interest
        bearing loan (loan) to be advanced over 12 monthly payments of $7,500. The payments will
        begin on the 1st of the month following the beginning of solicitations (expected to be
        November 1, 2005) and will continue for the next 11 months.

             Repayment of the loan will be from Clients proceeds in excess of Consultants billings
        (excess funds) for the first 12 months. In the event that an outstanding loan balance exists
        after month 12, then Client will pay 50% of the excess funds until such time as the loan is
        fully paid out.

3.0     Supplementing and modifying Paragraph 2.01 of Schedule A of the Agreement, Consultant
        acknowledges that its per Line Hour fees include the costs of: development of lists of
        potential donors for calling; all local and long-distance telephone charges; all wages and
        benefits of Consultant employees and contracts assigned to work on the Client's campaign;
        all printing and postage costs of pledge collection materials and reminder mailings; all costs
        related to receiving, recording, caging and depositing of donations to the Client's bank
        account; any legal or professional fees incurred by Consultant with respect to state
        registrations and filings required of Consultant; and all overhead costs incurred by
        Consultant in the carrying out of the Client's campaign. Consultant also acknowledges and
        agrees that it will not charge Client with any other costs or fees.

4.0     Consultant hereby represents, covenants and warrants that it is or will be licensed,
        registered and in compliance with all laws, rules, regulations including without limitation
        all filing, reporting and disclosure requirements, in all federal, state and local government
        jurisdictions within which it will conduct a campaign on behalf of Client. Consultant
        hereby covenants and warrants that it will timely file all reports (financial or otherwise),
        scripts, disclosures, interim and final closing statements, and all other filings required by all
        federal, state and local authorities having jurisdiction over Consultant, Client or this
        Agreement and will provide a copy of each report, disclosure, filing and closing statements
        to Client upon request.

5.0    At no cost to Client, Consultant through Copland International agrees to provide support to Client services directly related to programs operated by Consultant and advisory services related to general fundraising and charity management.

6.0    Client agrees to endeavor to states registered for solicitation as follows:

October 1, 2005:
Connecticut, Maryland, Massachusetts, Pennsylvania, California, New Jersey, Rhode Island, Washington, Missouri, Ohio, Texas and Utah

November 1, 2005:
Alabama, Arizona, Colorado, Georgia, Montana, Nevada, New Mexico, Idaho, Iowa, Illinois, Indiana, Kansas, Michigan, New Hampshire, North Carolina, Oregon, South Carolina, South Dakota and Tennessee

December 1, 2005:
Florida, Kentucky, Minnesota, Nebraska, North Dakota, Oklahoma, Virginia, West Virginia, Wisconsin, Wyoming, Delaware and Hawaii.

Client warrants that it will have all states listed above, registered no later than March 1, 2006. Additional states will be registered as requested by Consultant.

The parties agree that, with the exception of the states of New York and Alaska, the Consultant shall have exclusive rights to telephone solicit on behalf of the Client throughout the United States of America for the term of this Agreement.

7.0    Client and/or its representatives will have the right following reasonable notice to Consultant to inspect and audit Consultant's books and records and procedures pertaining to any and all invoices, billings, donations and fees arising out of, relating to or emanating from this Agreement. Such inspection or audit shall take place at Consultant's principal office for the campaign within the United States or in Toronto, Canada. Consultant will cooperate with this audit and provide any and all information requested by the Client's auditors, including, but not limited to a copy of Consultant's SAS-70 Report. If any such inspection or audit indicates that Client has overpaid any charges or billings under this Agreement, Consultant will promptly refund to Client the amount of such overpayment. The provisions of this section will survive termination or expiration of this Agreement for a period of 12 months.

8.0    Each party to this Agreement hereby represents to the other that it is now a validly formed and existing entity with the legal right to conduct its business; that it has the right and authority to enter into this Agreement; and that, upon execution and delivery hereof, this Agreement will constitute a valid and binding obligation upon each such entity, subject to the terms hereof. The persons executing this Agreement on behalf of each such entity represent that they have full right and authority to do so. Each party represents to the other that the execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby require no further action, approval, consent, order or authorization under any corporate charter, certificate of incorporation, resolutions or by-laws.

9.0   This Agreement has been made in the State of New York. Each of the parties signing this Agreement consents to the jurisdiction of the courts in the State of New York. The rights and liabilities of the parties must be determined in accordance with the laws of the State of New York without reference to its conflicts of law principles. Any action or proceeding arising out of, relating to or emanating from this Agreement must be commenced and maintained in either the Supreme Court of the State of New York, Nassau or Suffolk Counties, or the United States District Court, Eastern District of New York.

XENTEL, INC.

Per: _____
     David Winograd, President

Date: _____8·29·05_____

UNITED BREAST CANCER FOUNDATION

Per: _____
     Stephanie Mastroianni
Title: _____President_____
Date: _____8/24/05_____

Per: _____Mary E. Heim_____
Name: _____MARY E. HEIM_____
Title: _____Secretary_____
Date: _____9/1/05_____

MARC SZOZUROWSKI
Notary Public, State of New York
No. 01SZ6110350
Qualified in Suffolk County
Commission Expires May 24, 2008

SCHEDULE "C" attached to and forming part of an Agreement dated
August 22, 2005, between
Xentel, Inc. ("Consultant") and
United Breast Cancer Foundation ("Client")

WHEREAS, Consultant and Client are parties to a certain agreement dated August 22, 2005, and WHEREAS, in order to effect registration in compliance with the laws of the states listed below and for that portion of the contract where activities will be conducted in the states listed below an addendum is required.

WITNESSETH

FOR AND IN CONSIDERATION of the mutual covenants herein contained, the sufficiency of which is acknowledged as evidenced by the signatures of the parties hereto, it is mutually agreed as follows:

1. In order to comply with various state statutes, the following shall be included as terms of the agreement for the various states.

   a. For purposes of the State of Indiana only, the following shall apply:
   Client shall receive as a result of this solicitation campaign twenty (20%) of gross revenue, or the amount set forth in the main Agreement, dated August 22, 2005, whichever is greater. This is an estimated percentage based upon the experience of similar campaigns conducted by Consultant. This shall not affect compensation provisions as listed in the main Agreement.
   The average percentage of gross contributions received by sponsoring organizations as a result of campaigns conducted by Consultant in the three years preceding this agreement is ten percent (10%).

   b. For purposes of the State of Connecticut only, the following shall apply:
   Client shall receive as a result of this solicitation campaign twenty (20%) of gross revenue, or the amount set forth in the main Agreement, dated August 22, 2005, whichever is greater. This is an estimated percentage based upon the experience of similar campaigns conducted by Consultant. This shall not affect compensation provisions as listed in the main Agreement.

   c. For the purposes of the State of Mississippi, the following shall apply:
   Solicitation activity is to commence on October 1, 2005 within the State of Mississippi or ten working days after the contract is received by the Office of the Secretary of State .
   All oral and written presentations to be used by Consultant (and material changes thereto), shall have been reduced to a writing and shall have been reviewed and approved by client.
   Solicitation activity and the contract will terminate on September 30, 2010, within the State of Mississippi.

d.  For the purposes of the State of Pennsylvania, the following shall apply:

Guarantee to Client:  Client shall receive as a result of this solicitation campaign, a minimum guarantee of twenty (20%) of gross revenue.  This shall not affect or alter compensation provisions as listed in the main Agreement dated August 22, 2005.

Percentage to Professional Solicitor.  Client agrees that Consultant shall be compensated pursuant to the terms of the agreement which is estimated to be 80% of gross revenue. This estimated percentage is based on projected figures for average pledge amount participation percentage and fulfillment percentage.   While every project varies in results and yield, this assumption is based on industry standards.  This shall not affect or alter compensation provisions listed in the main Agreement dated August 22, 2005.

Solicitation activity is to commence on October  1, 2005 within the Commonwealth of Pennsylvania or ten working days after the Solicitation Notice is received by the Department of State, Bureau of Charitable Organizations and/or is approved by the Department of State Bureau of Charitable Solicitations.

Solicitation activity and the contract will terminate on September 30, 2010 within the Commonwealth of Pennsylvania.

e.  For the purposes of the State of Oregon, the following shall apply:

Client shall receive as a result of this solicitation campaign twenty (20%) of gross revenue, or the amount set forth in the main Agreement, dated August 22, 2005, whichever is greater.  This estimated percentage is based on projected figures for average pledge amount participation percentage and fulfillment percentage.   While every project varies in results and yield, this assumption is based on industry standards. This shall not affect or alter compensation provisions listed in the main Agreement dated August 22, 2005. This shall not affect compensation provisions as listed in the main Agreement.  The actual percentage going to Client shall not be less than the estimated percentage minus ten percent of the gross revenue.

The name and address of each person pledging to contribute, together with the date and amount of the pledge, shall be the sole exclusive property of the Client with no rights to transfer, sell, rent, or otherwise cause same to be used except by Client.

f.  For the purposes of the State of New Hampshire, the following shall apply:

All customer lists acquired in the State of New Hampshire along with the names, addresses, date and pledge amount of all sales shall be the sole exclusive property of the Client with no rights to transfer, sell, rent, or otherwise cause same to be used except by the Client.

Client shall receive as a result of this solicitation campaign twenty (20%) of gross revenue, or the amount set forth in the main Agreement, dated August 22, 2005, whichever is greater.  This estimated percentage is based on projected figures for average pledge amount participation percentage and fulfillment percentage.   While every project varies in results and yield, this assumption is based on industry standards. This shall not affect or alter compensation provisions listed in the main Agreement dated August 22, 2005. This shall not affect compensation provisions as listed in the main Agreement.  The actual percentage going to the Client shall not be less than the estimated percentage minus ten percent of the gross revenue.

g.  For the purposes of the State of South Carolina, the following shall apply:

Solicitation activity is to commence on November 1, 2005 within the State of South Carolina or ten working days after the contract is received by the Office of the Secretary of State.

All oral and written presentations to be used by Consultant (and material changes thereto), shall have been reduced to a writing and shall have been reviewed and approved by client.

Solicitation activity and the contract will terminate on September 30, 2010, within the State of South Carolina.  Oral solicitations will be conducted from 1061 Main Street #2D31, North Huntingdon, PA 15642.  Regional Supervisor – Matt McFall, Branch Manager – John Baemmert.

h.  For the purposes of the State of Illinois, the following shall apply:

Consultant shall bear all costs and expenses the telephone solicitation campaign. Expenses shall include but are not limited to (stated as estimated percentage of gross receipts):  Payroll ~ 38%;  Branch office expenses ~9%;  Corporate office expenses~11%; Printing ~5%;  Postage~4%;  Telephone~10%;  Xentel, Inc.~7%.

i.  For the purposes of the State of Ohio, the following shall apply:

Client shall receive as a result of this solicitation campaign twenty (20%) of gross revenue, or the amount set forth in the main Agreement, dated August 22, 2005, whichever is greater.  This estimated percentage is based on projected figures for average pledge amount participation percentage and fulfillment percentage.  While every project varies in results and yield, this assumption is based on industry standards. This shall not affect or alter compensation provisions listed in the main Agreement dated August 22, 2005. This shall not affect compensation provisions as listed in the main Agreement.  The actual percentage going to the Client shall not be less than the ninety (90%) percent of the reasonable estimated percentage.

j.  For the purpose of the State of New Jersey, the following shall apply:

All revenues resulting from this Agreement shall be collected by XI on behalf of the Client.

All of said revenues shall be delivered timely by Consultant to the Client for immediate deposit, within two (2) days of receipt, into an account under the Client's sole ownership and control.  Chase Bank , 111 East Wisconsin Avenue, Milwaukee, WI 53202 Account #_____.

k.  For the purposes of the State of New Mexico, the following shall apply:

Guarantee to Client:  The minimum percentage of gross receipts from the charitable solicitations that will be used by the Client exclusively to advance its charitable purpose is twenty (20%).  This shall not affect or alter compensation provisions as listed in the main Agreement dated August 22, 2005.

All of said revenues shall be delivered timely by Consultant to the Client for immediate deposit, within two (2) days of receipt, into an account under the Client's sole ownership and control.

Oral solicitations will be conducted from 1061 Main Street #2D31, North Huntingdon, PA 15642. Regional Supervisor – Matt McFall, Branch Manager – John Baemmert.

I.   For the purposes of the State of Washington, the following shall apply:

Client shall receive as a result of this solicitation campaign twenty (20%) of gross revenue, or the amount set forth in the main Agreement, dated August 22, 2005, whichever is greater.   This estimated percentage is based on projected figures for average pledge amount participation percentage and fulfillment percentage.   While every project varies in results and yield, this assumption is based on industry standards. This shall not affect or alter compensation provisions listed in the main Agreement dated August 22, 2005. This shall not affect compensation provisions as listed in the main Agreement.  The actual percentage going to the Client shall not be less than the estimated percentage minus ten percent of the gross revenue.

IN WITNESS WHEREOF, the parties hereunto affixed their hands on this ☒ day of _August_ , 2005.

Witness

XENTEL INC.

By: _____
     David Winograd, President

Witness

MARC SZCZUROWSKI
Notary Public, State of New York
No. 01SZ6110350
Qualified in Suffolk County
Commission Expires May 24, 2008

UNITED BREAST CANCER FOUNDATION

By: _____
     Stephanie Mastroianni, _____

By: _____
     _____ G. HEIM (Sec)/ Treas.

SCHEDULE "D" attached to and forming part of the agreement dated August 22, 2005
between Xentel, Inc. ("XI")
and United Breast Cancer Foundation. ("Sponsor")

This addendum is made and entered into this 20th day of April, 2006 by and between
XENTEL, INC. (hereinafter referred to as "XI") and UNITED BREAST CANCER
FOUNDATION, a non-profit corporation (hereinafter referred to as "CLIENT")

WHEREAS, XI and CLIENT are parties to a certain agreement dated the 22nd day of
August, 2005.

WHEREAS, in order to effect registration in compliance with individual state laws across
the United States for activities to be conducted on behalf of CLIENT an addendum is required.

The wording in Paragraph 5.00 Bank Account, of the attached agreement shall be changed
to the following:

5.00   BANK ACCOUNT

5.01   All monies in the form of checks, money orders, bank drafts or cash received by Consultant
on Client's behalf pursuant to this Agreement (the "Gross Receipts") will be segmented by
Campaign Phase and Segment and directly deposited, within two (2) days of receipt, into a
checking account in the name of Client at a Chase Bank branch located in Milwaukee, WI (the
"Bank Account"), not including weekends and holidays.  The Bank Account will be used solely for
the purposes of the Campaign.  Client will have sole control of the Bank Account and will be the
sole signing authority on the Bank Account.

5.02   Consultant may also collect monies on Clients behalf by means of accepting credit
card payments by phone.  Credit card payments will be deposited to Consultant's merchant banking
account(s) in trust for the Client, and will be transferred, in their entirety, to Client's bank account
within two (2) days of receipt, not including weekends and holidays.

5.03   Client and Consultant agree that all monies deposited into the Bank Account will be
for Client's sole use.

In all other respects not specifically modified herein, the existing agreement dated the 22nd day of
August, 2006 shall remain in full force and effect.  A copy of said agreement is attached hereto and
incorporated herein by this reference.

WHEREFORE, the parties hereto have executed this addendum on 20th day of June, 2006
and first above written.

IN WITNESS WHEREOF the parties attest that they have the power and authority to bind and
have executed this Agreement this 20th day of June, 2006,

XENTEL, INC                                    UNITED BREAST CANCER
                                               FOUNDATION

Per: _____                   Per: _____
     David Winograd, President                      Stephanie Mastroianni, President

Date: ___8-2-06___                             Date: ___7-30-06___

3



American Arbitration Association
*Dispute Resolution Services Worldwide*

**General ARBITRATION RULES**

(ENTER THE NAME OF THE APPLICABLE RULES)

**Demand for Arbitration**

| | |
|---|---|
| **MEDIATION:** *If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box.* ☐ *There is no additional administrative fee for this service.* | |

| Name of Respondent<br>United Breast Cancer Foundation | Name of Representative (if known)<br>John G. Poli, III |
|---|---|
| Address:<br>223 Wall Street | Name of Firm (if applicable):<br>John G. Poli, III, P.C. |
| Suite 368 | Representative's Address<br>P.O. Box 59 |

| City<br>Huntington | State<br>NY | Zip Code<br>11743 | City<br>Northport | State<br>NY | Zip Code<br>11768 |
|---|---|---|---|---|---|
| Phone No.<br>877-822-4287 | | Fax No.<br>631-549-4527 | Phone No.<br>(631) 262-9696 | | Fax No.<br>(631) 470-2820 |
| Email Address:<br>unknown | | | Email Address:<br>polilaw11768@aol.com | | |

The named claimant, a party to an arbitration agreement dated August 22, 2005_____, which provides for arbitration under the not stated_____Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE

failure and refusal to pay fees earned pursuant to contract

| Dollar Amount of Claim $ 139,891.91 | Other Relief Sought: ☒ Attorneys Fees   ☒ Interest<br>☒ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other _____ |
|---|---|

Amount Enclosed $ 500.00 _____   In accordance with Fee Schedule: ☐Flexible Fee Schedule   ☒Standard Fee Schedule

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
charities and fundraising knowledge, and general commercial background

Hearing locale New York City _____   (check one) ☐ Requested by Claimant   ☒ Locale provision included in the contract

| Estimated time needed for hearings overall:<br>_____ hours or   2.00 _____ days | Type of Business:  Claimant fundraising _____<br>Respondent charity _____ |
|---|---|

Is this a dispute between a business and a consumer?   ☐Yes ☒No
Does this dispute arise out of an employment relationship?   ☐Yes ☒No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐Over $250,000

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| Signature (may be signed by a representative)     Date:<br>4/12/10 | Name of Representative<br>Randy M. Friedberg |
|---|---|
| Name of Claimant<br>Courtesy Health Watch, Inc. | Name of Firm (if applicable)<br>White and Williams LLP |
| Address (to be used in connection with this case):<br>616 SW 6th Street | Representative's Address:<br>250 West 34th Street, 41st Floor |

| City<br>Ft. Lauderdale | State<br>FL | Zip Code<br>33315 | City<br>New York | State<br>NY | Zip Code<br>10119 |
|---|---|---|---|---|---|
| Phone No.<br>954-522-5200 | | Fax No. | Phone No.<br>212-714-3079 | | Fax No.<br>212-631-1241 |
| Email Address: | | | Email Address:<br>friedbergr@whiteandwilliams.com | | |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.  AAA Case Filing Services can be reached at 877-495-4185

**15.00   ATTORNEY FEES AND BINDING ARBITRATION**

**15.01**   In the event that there is any dispute concerning the terms and conditions of this Agreement, the parties agree to submit to binding arbitration pursuant to the rules of the American Arbitration Association and the prevailing party in any arbitration shall be entitled to an award of reasonable attorney's fees and costs.   The place of arbitration shall be in the counties of Suffolk, Nassau or New York in the state of New York.

4

AMERICAN ARBITRATION ASSOCIATION

---------------------------------------------------------------X

XENTEL, INC./COURTESY HEALTH WATCH, INC.,

                        Claimant,

      -against-

UNITED BREAST CANCER FOUNDATION,

                    Respondent.

---------------------------------------------------------------X

**RESPONDENT'S ANSWERING STATEMENT WITH AFFIRMATIVE DEFENSES AND COUNTERCLAIM**

AAA Case No. 13-193-00882-10

       The Respondent, United Breast Cancer Foundation ("UBCF"), as and for its Answering Statement and Counterclaim against Claimant, XENTEL, INC./COURTESY HEALTH WATCH, INC. ("Xentel"), by its attorney, John G. Poli, III, P.C., alleges as follows:

<strong>THE PARTIES</strong>

       1. UBCF ("Client or "Respondent") and Xentel ("Consultant" or "Claimant") entered into a written Agreement dated August 22, 2005 ("Contract" or "Consulting Contract"), under which UBCF retained Xentel's services to develop and implement a marketing program of potential donors by telephone canvassing and direct mail followup (i.e. the "Campaign time"). The term of this Contract is for a five (5) year period (i.e. 60 months) unless earlier terminated by the parties **(Exhibit "A")**.

<strong>THE CONTRACT</strong>

       2. The pertinent provisions of this Contract between the parties are as follows:

       **1.01(3)**: The Consultant shall provide as much "Campaign time" as possible up to the maximum stipulated in Schedule "A", as long as the 'Line Hour' pledge rate is 'economically viable,' and the Consultant agrees to "promptly advise Client should the said pledge rate not be viable;"

\*                    \*                    \*

**3.01(4)**: "Line Hour" means one telephone canvasser assigned to the Campaign working at one workstation for one hour with provision for break periods specified in applicable employment standards legislation;

**3.01(6)**: "Donor Acquisition" means seeking and securing donation from new supporters for the Client;

**3.01(7)**: "Donor Retention" means seeking and obtaining donations from Client's current and past members and/or donors;

**3.01(8)**: "Economically Viable Pledge Rate" means in any one phase of the Campaign at least $55.00 pledged per line hour on either Donor Acquisition or Membership Recruitment, and at least $130.00 pledged per line hour on Donor Retention;

**3.01(9)**: "Campaign Phase" means specifically Membership Recruitment, Donor Acquisition or Donor Retention activities conducted within any of the three (3) twelve month Campaign Periods, and all Gross Receipts associated therewith, even if accrued after completion of the Campaign Phase;

\*                    \*                    \*

**21.0**: This Agreement shall not be amended unless agreed to in writing by the parties.

\*                    \*                    \*

## SCHEDULE "A"

**2.01**: Client agrees to pay Consultant as follows, plus applicable taxes:

(1) Membership or Acquisition;

2

*                    *                    *

$<u>42.50</u> per Line Hour . . . . . . . . . . . . . . . . . .   .

*                    *                    *

(2) Donor Retention;

*                    *                    *

$<u>58.00</u> per line Hour . . . . . . . . . . . . . . . . . .   .

*                    *                    *

## SCHEDULE "B"

    <u>1.0</u>: If any provision of this Rider conflicts with any preprinted provision of this Agreement, the provisions of this Rider will control.

    <u>2.0(A)</u>: Notwithstanding anything contained in this Agreement to the contrary, Consultant hereby guarantees that Client will receive no less than 20% of the aggregate Gross Receipts raised by Consultant on behalf of Client during the full five year term of this Agreement.  If at the expiration of the Agreement, Client has not receive at least 20% of the total Gross Receipts raised by Consultant on behalf of Client during the Agreement term, Consultant will immediately remit to Client a sum equal to the difference between 20% of Gross Receipts and those funds received by Client.

    <u>2.0(B)</u>: Modifying Parargraph 2.01(2) of Schedule A to this Agreement, Consultant agrees that for each Line Hour of Donor Retention in excess of 2,000 Line Hours per year will be billed to Client at the reduced rate of <u>$48.00 per Line Hour</u>.

*                    *                    *

    <u>9.0</u>: This Agreement has been made in New York . . . . . Any action or

3

proceeding arising out of, relating to or emanating from this Agreement <u>must</u> be commenced and maintained in . . . . . . <u>Nassau or Suffolk Counties</u> . . . . . . .

## THE ARBITRABLE DISPUTE

3. It is undisputed that Xentel's internal billing system never conformed to the terms of Schedule "B" annexed to this Contract, and that UBCF was "overbilled" by Xentel for "donor retention" services at the rate of $58.00 per "line hour" in excess of 2,000.00 "line hours" per year, instead of the reduced rate of $48.00 per "line hour." Therefore, UBCF alleges that it is owed an aggregate sum of $62,070.80 as a result of this erroneous "overbilling" implemented by Xentel over a two (2) year period (i.e. 2007 and 2008).

4. From the inception of this Contract with UBCF, Xentel billed UBCF for all "donor acquisition" campaigns on <u>statewide</u> basis identified by individual "campaign numbers" that were assigned to each of these statewide campaigns. However, on or about January 1, 2009, and without UBCF's knowledge, Xentel elected to unilaterally modify its entire billing system for UBCF by combining all UBCF "donor acquisition" campaigns on a <u>nationwide</u> basis under a single billing code number ("888888") assigned to UBCF. UBCF first discovered this fundamental modification to Xentel's billing system following an audit of Xentel's financial books and records by UBCF in February 2009.

5. After this discovery, UBCF considered this unauthorized modification of Xentel's existing billing system a material breach of its Contract, and demanded that Xentel immediately restore its individual statewide campaign billing methodology and acknowledge that UBCF had been improperly billed by Xentel under this nationwide billing methodology for more than three (3) years.

6. Xentel then threatened to utilize the "not economically viable pledge rate" issue

4

(see para. 3.01[8]) to eliminate all of UBCF's "donor acquisition" campaigns as of September 1, 2009, and to limit all "donor retention" calling for UBCF to 2,000 "line hours." Furthermore, Xentel also applied its nationwide billing system retroactively for thirty-nine (39) months to all of UBCF's "donor acquisition" campaigns to support its belated and self-serving claim that it had "underbilled" UBCF in the amount of $89,672.50.

7. In turn, UBCF repeatedly requested any and all of the documentation confirming how Xentel arrived at its conclusion that the acquisition pledge rate was no longer "economically viable" (i.e. not profitable), which it failed to produce. Xentel's response to UBCF's refusal to consent to these unauthorized modification(s) to its Contract was to unilaterally eliminate all "donor acquisition" campaigns on behalf of UBCF as of September 1, 2009.

8. As stated above, UBCF never authorized in writing any of these proposed modification(s) or amendment(s) of Xentel's billing system. Indeed, UBCF expressly stated on several occasions that it did not agree with these unilateral changes, either retroactively or prospectively, and insisted that Xentel return to the existing statewide billing methodology and format it had continuously implemented and performed with UBCF over the last three (3) or so years.

9. As a result of this material breach of the Contract by Xentel, UBCF elected to terminate same as of midnight, January 31, 2010.

## AS AND FOR A FIRST
## AFFIRMATIVE DEFENSE

10. Since the Claimant ("Xentel") failed to "promptly advise" its Client ("UBCF") that it considered the "acquisition pledge rate" under this Contract was not "economically

viable," Xentel is precluded by the doctrines of waiver and/or estoppel from retroactively modifying its billing system in order to recover or offset the sum of $89,672.50 from UBCF.

### AS AND FOR A SECOND
### AFFIRMATIVE DEFENSE

11.   This Contract obligated the Consultant (Xentel) to "promptly advise" its Client (UBCF) if any "pledge rate" is no longer "economically viable."

12.   Xentel's nonperformance of this condition precedent requiring "prompt notice" to UBCF precludes Xentel's right to assert any claim (or defense) it may have in this proceeding on the grounds that any "pledge rate" for UBCF provided under this Contract was not "economically viable."

### AS AND FOR A THIRD
### AFFIRMATIVE DEFENSE

13.   Pursuant to Schedule "B" of this Contract, the venue of any action or proceeding "arising out of, or relating to or emanating from this [contract] must be commenced in Nassau or Suffolk Counties."

14.   Accordingly, the commencement of this arbitration proceeding by the Claimant in "New York County" is an improper venue for this proceeding, and in violation of the clear and unequivocal directives of this Contract.

### AS AND FOR A FIRST
### COUNTERCLAIM

15.   Respondent repeats and realleges each and every allegation set forth hereinabove.

16.   By reason of the foregoing, UBCF has been damaged by Xentel in the approximate sum of $259,360.38, calculated as follows:

6

a) $62,070.80 for the improper "overbilling" of UBCF for "donor retention" services provided by Xentel in 2007 and 2008;

b) $169,698.35 for UBCF's guaranteed payment from the Xentel of its twenty (20%) percent share of all funds raised (i.e. gross receipts) by Xentel on behalf of UBCF during the term of this Contract [see Schedule "B", para. 20(A)];

c) $27,591.23 for the additional loss of income to UBCF resulting from Xentel's unilateral and unauthorized modification of its billing system for the period from January 1, 2009 to January 31, 2010; and

d) the reasonable attorney fees and the costs incurred by UBCF in prosecuting and defending this arbitration, together with prejudgment interest, and for such other and further relief as the appointed Arbitrator herein deems just, proper and equitable.

Dated: Northport, New York
     June 16, 2010

JOHN G. POLI, III, P.C.
By: John G. Poli, III, Esq.
Attorney for Respondent UBCF
200 Laurel Avenue, P.O. Box 59
Northport, NY 11768
Tel. No.: (631) 262-9696
Fax No.: (631) 470-2820

7

**Exhibit A**

## THIS AGREEMENT SIGNED THIS 22ND DAY OF AUGUST, 2005

BETWEEN:

### XENTEL , INC
a Delaware Corporation with offices at
101 NE 3rd Avenue, Suite 203
Ft. Lauderdale, FL
33301           ("Consultant")

- and -

### UNITED BREAST CANCER FOUNDATION
An IRS 501 (c)(3) registered charitable organization with offices at
223 Wall Street, Suite 368
Huntington, NY
11743

          ("Client")

**RECITALS:**

**1.**     Consultant is registered where required as a professional solicitor/fundraiser pursuant to state laws, and has all necessary licenses and permits and full power and authority to carry on its business as contemplated by this agreement. Consultant has full legal right, power and authority to enter into this Agreement and to undertake the actions to be performed under this Agreement.

**2.**     Client is a not for profit corporation duly organized, validly existing and in good standing pursuant of the laws of the State of New York. Client has full legal right, power and authority to enter into this Agreement. Client is an organization that is exempt from federal income tax under Section 501 (C) (3) of the Internal Revenue Code of 1986, as amended (the "Code").

**3.**     Client wishes to engage the services of Consultant on the terms set out in this Agreement to conduct an annual multi-phase "BeneCall™" campaign (the "Campaign") comprised of a sixty (60) month term beginning October 1, 2005 and ending September 30, 2010.

**THIS AGREEMENT WITNESSES:**

**1.00    CONSULTANT'S OBLIGATIONS**

**1.01**    Client engages the services of Consultant and Consultant agrees to:

      (1)     Develop and implement a marketing program for the Campaign for Client by means of telephone canvass with direct mail follow up for fulfillment purposes;

Contract #: 3877

(2)    Manage the marketing, collection, reporting and deposit of monies received on behalf of Client;

(3)    Provide as much Campaign time as possible up to the maximum stipulated in Schedule "A", as long as the Line Hour pledge rate is economically viable, and promptly advise Client should the said pledge rate not be viable.

1.02    In order to fulfill its obligations under this Agreement Consultant will, at its sole cost:

(1)    Maintain a staff sufficient to conduct promotion and marketing of the Campaign;

(2)    Maintain office space, furnishings, office equipment, secretarial services, and telephones and phone services sufficient to conduct the Campaign;

(3)    Arrange for and produce, subject always to Client's prior review and approval, all necessary printed materials including, but not limited to: pledge forms, fulfillment packages, envelopes, order forms (the "Advertising Materials") and other materials necessary for the success of the Campaign;

(4)    Arrange for and complete the mailing of all Campaign associated materials, provided that the Consultant shall not pay the costs of any newsletter distribution by Client other than those prescribed for the Campaign nor shall Consultant pay for postage or costs of printed materials associated with mailing receipts to donors; and

(5)    Pay when due expenses incurred in the performance of its obligations under this Agreement.

1.03    At all times, Consultant shall abide by all applicable Federal, State or municipal laws or regulations pertaining to direct marketing and fund-raising practices, as well as to applicable industry codes of ethics.

1.04    Client and Consultant recognize the Campaign will generate some inquiries and even complaints from consumers. Consultant will respond in a professional and courteous manner to any complaint raised by consumers in relation to the Campaign and will do its best to resolve any complaint to the consumer's satisfaction. Consultant will provide Client pre-printed customer inquiry forms for documentation of inquiries pertaining to the Campaign received by Client. Client will then complete and fax these forms to the Consultant for action.

## 2.00   PERMITS, CONSENTS AND TAXES

2.01    All necessary permits, consents, licenses, clearances or other permissions that may be required by any validly constituted governmental authority for the Campaign will be obtained by and at the expense of Client with the assistance of Consultant. **CLIENT MAY BE REQUIRED TO REGISTER WITH THE STATE(S) IN WHICH CAMPAIGN OPERATES. THIS SHALL BE THE SOLE RESPONSIBILITY OF CLIENT.**

2.02    Failure of Client to obtain said permits in a timely fashion after reasonable notice received from Consultant may result in termination of this Agreement, at sole discretion of

Consultant. In this event Client will be liable for and shall forthwith reimburse Consultant for all reasonable expenses incurred up to and including date of such termination.

2.03     Consultant agrees that should it be incumbent on Client to collect and remit any federal, state or other sales tax on the sale of products or services to the general public, such products or services being delivered by Consultant on behalf of Client, then Consultant shall do so and remit said taxes to Client for conveyance to the appropriate authorities. Provided Consultant fulfills its obligations under this paragraph, liability for collection and remittance of said taxes rests solely with Client.

## 3.00   DEFINITIONS

3.01    In this Agreement:
    (1)    "Lists" mean:

        a)    lists of supporters of previous campaigns managed by Consultant on behalf of Client;

        b)    list of people who have not supported previous campaigns managed by Consultant on behalf of Client but who have supported other projects managed by Consultant;

        c)    lists of persons who have not supported any of Consultant's clients;

        d)    any other form of information relating to purchasers of advertising or tickets, or supporters of projects managed on behalf of any of Consultant's clients not already included in the definition of Lists;

        e)    but excludes any such lists already in possession of Client prior to the effective date of this Agreement.

    (2)    "Donor List" is a list in electronic form of paid contributors to the Campaign;

    (3)    "Confidential Information" means any information designated in writing by Client or Consultant as confidential;

    (4)    "Line Hour" means one telephone canvasser assigned to the Campaign working at one workstation for one hour with provision for break periods specified in applicable employment standards legislation;

    (5)    "Membership Recruitment" means seeking and securing new members for the Client;

    (6)    "Donor Acquisition" means seeking and securing donation from new supporters for the Client;

    (7)    "Donor Retention" means seeking and obtaining donations from Client's current and past members and/or donors;

(8)    "Economically Viable Pledge Rate" means in any one phase of the Campaign at least $55.00 pledged per line hour on either Donor Acquisition or Membership Recruitment, and at least $130.00 pledged per line hour on Donor Retention;

(9)    "Campaign Phase" means specifically Membership Recruitment, Donor Acquisition or Donor Retention activities conducted within any of the three (3) twelve month Campaign Periods, and all Gross Receipts associated therewith, even if accrued after completion of the Campaign Phase;

(10)   "Segment" is a distinct Donor retention marketing initiative conducted within a given twelve month Campaign Period.

## 4.00    DONOR LISTS AND CONFIDENTIAL INFORMATION

**4.01**    Client agrees that, except as provided herein, Lists or other Confidential Information which Consultant owns prior to the commencement of this Agreement or develops during the term of this Agreement are exclusive property of Consultant and may not be utilized, in whole or in part, in any way by Client without the express prior written consent of Consultant. Consultant agrees that Lists or other Confidential Information which Client owns prior to the commencement of this Agreement or develops during the term of this Agreement, are exclusive property of Client and may not be utilized in whole or in part in any way by Consultant without the express prior written consent of Client.

**4.02**    Each party's Lists and Confidential Information shared with the other party will be kept in strictest confidence and will not be duplicated, copied, reproduced or otherwise retained by the recipient party, nor used in any other manner without the express prior written consent of the originating party.

**4.03**    Provided that Client has met its financial obligations under this Agreement and any schedules, addenda or written amendments hereto, Consultant shall prepare and deliver in electronic form to Client on a weekly basis the list of donors to the Campaign (the "Donor List"). The Donor List is the property of Client and will not be used by Consultant for any other purpose. Client recognizes and agrees that Consultant may update its lists and databases with transactional information derived from the Campaign.

**4.04**    Client may, from time to time during the Campaign, provide Consultant with a "Do Not Call" list, and Consultant shall refrain from contacting any donor or potential donor named on such list or lists during the Campaign. Client shall, at all times, be permitted to solicit or continue to solicit any donor or potential donor named on any such list. The scope of the Do Not Call list shall in no event be such that it will unduly limit Consultant's ability to meet its responsibilities under this Agreement.

## 5.00    BANK ACCOUNT

**5.01**    All monies in the form of checks, money orders, bank drafts or cash received by Consultant on Client's behalf pursuant to this Agreement (the "Gross Receipts") will be segmented by Campaign Phase and Segment and directly deposited, within two (2) days of receipt, into a checking account in the name of Client at a Chase Bank branch located in Milwaukee (the "Bank Account") within two days of receipt, not including Saturdays and holidays.  The Bank Account will be used solely for the purposes of the Campaign.  Client will

have sole control of the Bank Account and will be the sole signing authority on the Bank Account.

5.02    Consultant may also collect monies on Client's behalf by means of accepting credit card payments by phone. Credit card payments will be deposited to Consultant's merchant banking account(s) in trust for the Client, and will be transferred, in their entirety, to Client's bank account within 2 business days of receipt.

5.03    Client and Consultant agree that all monies deposited into the Bank Account will be for Client's sole use.

## 6.00    INSURANCE AND BONDING

6.01    Throughout the term of this Agreement, Consultant shall obtain and maintain at its sole cost and expense for itself and for its employees and agents, policies of insurance or bonds by which contributions to the Campaign will be protected against any loss occasioned by the neglect or dishonesty of Consultant, its employees or agents.

6.02    Consultant warrants that it will post and maintain in good standing such bonds as may be required by regulators in the jurisdiction(s) in which the Campaign is conducted.

## 7.00    FINANCIAL OBLIGATIONS

7.01    In consideration of Consultant performing its obligations under this Agreement, Client will pay Consultant as provided for in Schedule "A".

7.02    Every Friday during the term of this Agreement, or on such other day agreed upon by the parties considering Client's book-keeping schedule, Consultant will invoice Client for services rendered for each phase of the Campaign.

7.03    Client agrees to pay all Consultant's invoices within ten (10) days from date of invoice, by means of Electronic Funds Transfer where available, otherwise by check. Invoices will not be presented unless sufficient Gross Receipts have been deposited to Client's account. Interest will be charged at a rate of 2.0% per month (effective rate 24% per annum) on all overdue invoices.

7.04    Client agrees that should it, without valid reason, fail to pay Consultant's invoices within thirty (30) days of invoice, the Consultant may at its sole discretion, and the Client hereby specifically authorizes the Consultant to so do, appoint a qualified third party as trustee of the Bank Account disbursing the funds therein, in strict accordance with the terms of this Agreement.

## 8.00    REPORTING

8.01    Together with the delivery of its invoices for services rendered, Consultant shall, at its sole cost and expense, provide to Client for each Campaign Phase or Segment a report of all Gross Receipts processed by Consultant during the billing period just ended, together with proof of deposit slips indicating the direct deposit into the Bank Account.

8.02    Consultant agrees to provide weekly activity reports, segmented by Campaign Phase or Segment, to Client on a regular basis indicating:

- dollar value of pledges, weekly and cumulative
- pledges paid, weekly and cumulative
- number of pledges, weekly and cumulative
- number of line hours used, weekly and cumulative
- number of line hours billed to Client, weekly and cumulative

## 9.00    RELATIONSHIP OF PARTIES

9.01    Consultant agrees that it will not contract in the name of Client and that it will not, in any manner, bind or purport to bind Client to any obligation, charge or payment without having first received, in writing, the consent of Client to be so bound.

9.02    Neither this Agreement nor any activities of Client or Consultant contemplated by this Agreement constitutes a joint venture, partnership or any other relationship between the parties other than that of Client and Consultant.

## 10.00   SIMILAR EVENTS AND RIGHT OF FIRST REFUSAL

10.01   Client agrees that it will not schedule any campaign similar to or the same as that contemplated by this Agreement within the areas specified in Schedule "A" within the 90 day period prior to the commencement date of, nor during, the Campaign.

10.02   Parties acknowledge that Consultant currently is contracted by the following cancer related organizations:

- National Cancer Coalition, New Orleans, LA

- Cancer Recovery Foundation of America, Harrisburg, PA

10.03   Subject to satisfactory compliance by Consultant with the terms and conditions of this Agreement, Client will offer, on the terms hereinafter set out, right of first refusal to Consultant should Client wish to:

(1)     utilize the services of a professional marketing organization during the twelve months following the end of the term of this Agreement; or
(2)     repeat the Campaign in the twelve months following the term of this Agreement.

10.04   Client agrees that, in accordance with Paragraph 10.02, if Client wishes to secure competing bids for Consultant's services, Client will present to Consultant a bona fide copy of the bid which Client wishes to accept. Consultant shall have five (5) business days from the date of receiving the bid to respond. If Consultant wishes to meet all terms and conditions of the competing bid, Consultant shall be granted the contract on the identical terms and conditions of the competing bid, except as may be otherwise mutually agreed by Client and Consultant. In the event Consultant does not wish to meet the terms and conditions of the competing bid, it shall advise Client in writing within such 5 business day period and Client shall then be free to contract with any service provider it wishes.

**11.00 TELEPHONE SCRIPT, ADVERTISING MATERIAL, RECORDING & DISCLOSURE**

11.01 Consultant will provide to Client for Client's approval all scripts (the "Script") and advertising material (the "Advertising Material") to be used by Consultant in the Campaign. The Script and Advertising Material shall not be used by Consultant until it is in a form approved by Client, and will not be amended without the prior, written approval of Client.

11.02 Client's representatives are welcome at Consultant's offices anytime during the Campaign in order to satisfy themselves that the approved Script is being substantially and faithfully followed.

11.03 Consultant agrees to exercise supervision to ensure strict compliance by its staff, agents, employees and subcontractors with the approved Script.

11.04 Consultant will abide by each applicable jurisdiction's laws pertaining to monitoring or recording of its employees' conversations with consumers. Consultant will make copies of all recordings available to Client for its review.

11.05 Consultant will abide by each applicable jurisdiction's laws pertaining to disclosure of Campaign information and Client will assist Consultant by, in a timely way, providing, filing as required, and making public such financial or other information for the Campaign or its other activities as may be required by all applicable laws, rules and regulations.

11.06 Client acknowledges that Consultant is relying upon information provided to it by the Client for the conduct of the Campaign and compliance with laws of various jurisdictions. Client warrants that information it provides to Consultant is accurate, truthful and up-to-date, and Client assumes all responsibility for and indemnifies Consultant for any action resulting from Consultant's use of such information subject to 11.01 through 11.06 of this Agreement.

**12.00 ASSIGNMENT OF AGREEMENT**

12.01 Consultant may not assign this Agreement or any portion thereof to a bona fide third party contractor unless:

1) Client provides its prior written consent;
2) Such third party provides such undertakings and assurances as required by the Agreement;
3) Such assignment or subcontract incorporates all of the terms contained in this Agreement.

**13.00 NOTICES**

13.01 All notices, demands or statements provided for in this Agreement and any other notices which may be deemed necessary shall be in writing and delivered personally or forwarded by certified mail to the following address, or addresses as may be designated by either of the parties in accordance with the provisions of this section.

13.02   Notices will be deemed to have been received or made upon the day upon which notice is personally delivered or, if posted via Certified Mail, then on the fourth business day following the date of mailing:

|       |                    |                                                                 |
|-------|--------------------|-----------------------------------------------------------------|
| (1)   | to Client at:      | **UNITED BREAST CANCER FOUNDATION** 223 Wall Street, Suite 368 Huntington, NY  11743 |

**Attention: Stephanie Mastroianni**
**Telephone No.: (877) UBC-4CURE**

With a copy to:

**Capell Vishnick LLP**
3000 Marcus Avenue, Suite 1E9
Lake Success, NY  11042

**Attention: Christopher McDonald**

(1)   to Consultant at:

**XENTEL, INC.**
203, 101 NE 3rd Avenue
Ft. Lauderdale, FL  33301

**Attention: Michael Platz**
**Telephone No.: (954) 522-5200**

## 14.00   INDEMNITIES

14.01   Consultant agrees to and does hereby indemnify Client against all claims, losses, liabilities, costs and expenses, which may be incurred by Client as a result of any breach of this Agreement by Consultant, its employees or its agents.

14.02   Client agrees to and does hereby indemnify Consultant against all claims, losses, liabilities, costs and expenses, which may be incurred by Consultant as a result of any breach of this Agreement by Client, it employees or its agents.

## 15.00   ATTORNEY FEES AND BINDING ARBITRATION

15.01   In the event that there is any dispute concerning the terms and conditions of this Agreement, the parties agree to submit to binding arbitration pursuant to the rules of the American Arbitration Association and the prevailing party in any arbitration shall be entitled to an award of reasonable attorney's fees and costs.  The place of arbitration shall be in the counties of Suffolk, Nassau or New York in the state of New York.

## 16.00   LEGAL ADVICE

16.01   The client confirms that Consultant has recommended Client obtain qualified independent legal advice prior to signing this Agreement.

## 17.00   INTERPRETATION

**17.01**   Should part of this Agreement be or become illegal or unenforceable, that part will be considered severable from this Agreement and the remainder of this Agreement will remain in effect as though the illegal or unenforceable parts had not been included.

**17.02**   All provisions of this Agreement are to be construed as covenants and Agreements as though the words imparting covenants and Agreements were used in each case.

**17.03**   Wherever the singular number or gender are used in this Agreement, it will be construed to include the plural, masculine, feminine or neuter, respectively, as the context requires.

## 18.00   ENUREMENT

**18.01**   This Agreement ensures to the benefit of and binds the successors and assigns of the parties.

## 19.00   FURTHER ASSURANCES

**19.01**   The parties agree to do all acts, including the execution of all documents, as may be necessary to fulfill this Agreement.

## 20.00   TIME

**20.01**   Time is of the essence of this Agreement.

## 21.00   AMENDMENT

**21.01**   This Agreement shall not be amended unless agreed to in writing by the parties.

## 22.00   TERM OF AGREEMENT

**22.01**   This Agreement shall remain in force for sixty (60) months from October 1, 2005, through September 30, 2010. However, provisions relating to Financial and Accounting Obligations, Similar Events, Lists and Confidential Information contained in this Agreement shall survive the expiry or early termination of this Agreement.

## 23.00   EARLY TERMINATION

**23.01**   Client reserves the right to amend or revoke this Agreement in the event of administrative, judicial  or other governmental findings, inconsistent with the reporting of Client as a result of the Agreement as follows:

(a)   Client shall provide Consultant written notice of its intent sixty (60) days before the effective date of such amendment or revocation, which period shall begin on the date of mailing. If Client chooses to amend the Agreement, said amendment must be acceptable to Consultant.

(b)     Should any annual campaign be commenced before the sixty (60) day notice, this Agreement, as written, shall remain in effect until there has been full contract performances necessary for completion of such campaign, including payment of all invoices.

23.02   Consultant and Client may terminate this Agreement at either's discretion within ninety (90) days written notice, except as follows:

(i)     both parties agree to a shorter termination period; or

(ii)    if this Agreement survives to its first anniversary then neither party may exercise this termination clause for the balance of the term except in the case of negligence in breach of the terms of this Agreement by the other party. Notwithstanding the foregoing, Consultant will immediately cease and desist all fundraising activities on receipt of such notice if the termination results from a breach by Consultant of this Agreement or an unreasonable amount of complaints or negative publicity as a result of the campaign.

23.03   Provisions relating to Financial and Accounting Obligations, Similar Events, Lists and Confidential Information contained in this Agreement shall survive termination of this Agreement.

## 24.00 DEADLINE DATE

24.01   Until signed, this contract constitutes an offer to provide services. In order for Consultant to properly license this Agreement and execute it's responsibilities in a timely manner this offer must be accepted and returned by September 1, 2005. In the event that such acceptance is not forthcoming by this date, then Consultant reserves the right to withdraw this offer.

## 25.00 CAUTION TO ALL CLIENTS

25.01 Consultant advises Client that while fund-raising by telephone canvassing has generally proven to be a reliable method of securing net income, it should never become the Client's sole means of income generation. Client is strongly encouraged to use telephone canvassing only as one of several methods of securing donations and only as a part of an integrated marketing and fund-raising program. Client is cautioned that failure to do so could result in unacceptably high overhead cost ratios for fund-raising and may result in negative consequences for the Client in its relationship with donors or government agencies.

25.02   Client acknowledges and accepts that results achieved from telephone fund-raising programs may be negatively affected by factors beyond the control of either Client or Consultant. These factors include but are not limited to: changes in applicable government legislation and regulations; changes in call centre technology required to meet changes in legislation and regulations; major news events covered in the media; media coverage of Client's cause or operations; actions taken by government bodies or the media in opposition to Client's interests; postal strikes; interruptions of electrical power, telephone or other essential services; and Acts of Nature. Consultant accepts no liability for any negative consequences to Client's campaign results which are caused by the above and similar factors.

25.03 During the planning and discussions related to a campaign Consultant or independent consultants representing Consultant may offer financial projections which are believed in good faith to be achievable for Client. Any such projections are for discussion and planning purposes only and do not form part of this Agreement.

## 26.0 CHARITABLE PURPOSE

United Breast Cancer Foundation is dedicated to:

❖ Offering emotional and spiritual support to those battling breast cancer as well as their family members and friends.

❖ Financially supporting institutions whose aim is the prevention, the treatment and the eradication of breast cancer.

❖ Educating the public with regards to the cancer-causing aspects of diet, environmental toxins and genetic disposition.

❖ Offers support in the way of peace of mind and spiritual well being to all of those afflicted and affected by breast cancer.

IN WITNESS WHEREOF the parties attest that they have the power and authority to bind and have executed this Agreement this 24 day of August , 2005.

XENTEL, INC

Per: _____

David Winograd, President

Date: 8-29-05

UNITED BREAST CANCER FOUNDATION

Per: _____
Stephanie Mastroianni
Title: President
Date: 8/24/05

Per: _____
Name: MARY E. HEIN
Title: Secretary
Date: 9/6/05

Notary Public

MARC SZCZUROWSKI
Notary Public, State of New York
No. 01SZ6110350
Qualified in Suffolk County
Commission Expires May 24, 2008

SCHEDULE "A" attached to and forming part of an Agreement dated
August 22, 2005, between
Xentel, Inc. ("Consultant") and
United Breast Cancer Foundation ("Client")

**1.00   CAMPAIGN AREAS**

1.01   The Campaign may be conducted throughout the continental United States.

**2.00   FEES**

2.01   Client agrees to pay Consultant as follows, plus applicable taxes:

|  |  |
|---|---|
| (1) Membership or Acquisition: | $16.25 per Line Hour for Program Promotion, |
|  | $18.75 per Line Hour for Support Development, |
|  | $ 7.50 per Line Hour Printing, Postage, Processing |
|  |     for a total of: |
|  | $42.50 per Line Hour up to a maximum of _____ |
|  |     Line Hours per Campaign Period, and |
| (2) Donor Retention: | $16.25 per Line Hour for Program Promotion, |
|  | $18.75 per Line Hour for Support Development, |
|  | $ 3.00 per Line Hour for Retention Reminders |
|  | $20.00 per Line Hour Printing, Postage, Processing |
|  |     for a total of |
|  | $58.00 per Line Hour up to a maximum of _____ |
|  |     Line Hours per Campaign Period. |

2.02   Client and Consultant agree that should Consultant's billings be greater than Gross Receipts of any Campaign Period, Consultant will discount its billings including applicable sales taxes to an amount equal to the Gross Receipts, thereby assuring Client of no possible loss.

**3.00   LIMITATION OF LIABILITY**

3.01   The guarantee as set out in paragraph 2.03 herein, is contingent upon the continued cooperation of Client and shall be subject to re-negotiation in the event of the following:

(a)   Either party shall become the subject of adverse media publicity that results in a significant demonstrable reduction in pledges and/or donations;

(b)   A regulatory body publicly releases a decision in an adjudicated case that a violation has occurred in the conduct of the campaign that results in a significant reduction in pledges and/or donations;

(c)   The occurrence of an unforeseen event such as but not limited to a labor strike, natural disaster, act of war or terrorism, or any other cause beyond Consultant's control that results in a significant demonstrable reduction pledges and/or donations;

(d)   Any law, regulation or licensing provision shall be modified as to materially affect the conduct of business as contemplated herein.

**4.00  DISCLAIMER**

**4.01**    Notwithstanding any other documents, discussions, or any other communication, Client and Consultant agree Consultant works on the Campaign on a best efforts basis. Client and Consultant agree that it is not a condition of this Agreement that Consultant meet any specified goals.  However, Client and Consultant will actively review Campaign results together and discuss Campaign progress.

**XENTEL, INC.**

Per: _____

Dave Winograd, President

Date: **8-29-05**

**UNITED BREAST CANCER**
**FOUNDATION**

Per: _____

Stephanie Mastroianni

Title: President

Date: 8/24/05

Per: _____

Name: MARY E. HEIM

Title: Secretary

Date: 9/6/05

MARC SZCZUROWSKI
Notary Public, State of New York
No. 01SZ6110360
Qualified in Suffolk County
Commission Expires May 24, 2008

SCHEDULE "B" attached to and forming part of an Agreement dated
August 22, 2005, between
Xentel, Inc. ("Consultant") and
United Breast Cancer Foundation ("Client")

**1.0**   If any provision of this Rider conflicts with any printed provision of this Agreement, the provisions of this Rider will control.

**2.0**   A.   Notwithstanding anything contained in this Agreement to the contrary, Consultant hereby guarantees that Client will receive no less than 20% of the aggregate Gross Receipts raised by Consultant on behalf of Client during the full five year term of this Agreement. If at the expiration of the Agreement, Client has not received at least 20% of the total Gross Receipts raised by Consultant on behalf of Client during the Agreement term, Consultant will immediately remit to Client a sum equal to the difference between 20% of Gross Receipts and those funds received by Client.

B.   Modifying Paragraph 2.01 (2) of Schedule A to this Agreement, Consultant agrees that for each Line Hour of Donor Retention in excess of 2,000 Line Hours per year will be billed to Client at the reduced rate of $48.00 per Line Hour.

C.   Consultant agrees to advance to Client the sum of $90,000 in the form of a non-interest bearing loan (loan) to be advanced over 12 monthly payments of $7,500. The payments will begin on the 1st of the month following the beginning of solicitations (expected to be November 1, 2005) and will continue for the next 11 months.

Repayment of the loan will be from Clients proceeds in excess of Consultants billings (excess funds) for the first 12 months. In the event that an outstanding loan balance exists after month 12, then Client will pay 50% of the excess funds until such time as the loan is fully paid out.

**3.0**   Supplementing and modifying Paragraph 2.01 of Schedule A of the Agreement, Consultant acknowledges that its per Line Hour fees include the costs of: development of lists of potential donors for calling; all local and long-distance telephone charges; all wages and benefits of Consultant employees and contracts assigned to work on the Client's campaign; all printing and postage costs of pledge collection materials and reminder mailings; all costs related to receiving, recording, caging and depositing of donations to the Client's bank account; any legal or professional fees incurred by Consultant with respect to state registrations and filings required of Consultant; and all overhead costs incurred by Consultant in the carrying out of the Client's campaign. Consultant also acknowledges and agrees that it will not charge Client with any other costs or fees.

**4.0**   Consultant hereby represents, covenants and warrants that it is or will be licensed, registered and in compliance with all laws, rules, regulations including without limitation all filing, reporting and disclosure requirements, in all federal, state and local government jurisdictions within which it will conduct a campaign on behalf of Client. Consultant hereby covenants and warrants that it will timely file all reports (financial or otherwise), scripts, disclosures, interim and final closing statements, and all other filings required by all federal, state and local authorities having jurisdiction over Consultant, Client or this Agreement and will provide a copy of each report, disclosure, filing and closing statements to Client upon request.

5.0     At no cost to Client, Consultant through Copland International agrees to provide support to Client services directly related to programs operated by Consultant and advisory services related to general fundraising and charity management.

6.0     Client agrees to endeavor to states registered for solicitation as follows:

October 1, 2005:
Connecticut, Maryland, Massachusetts, Pennsylvania, California, New Jersey, Rhode Island, Washington, Missouri, Ohio, Texas and Utah

November 1, 2005:
Alabama, Arizona, Colorado, Georgia, Montana, Nevada, New Mexico, Idaho, Iowa, Illinois, Indiana, Kansas, Michigan, New Hampshire, North Carolina, Oregon, South Carolina, South Dakota and Tennessee

December 1, 2005:
Florida, Kentucky, Minnesota, Nebraska, North Dakota, Oklahoma, Virginia, West Virginia, Wisconsin, Wyoming, Delaware and Hawaii.

Client warrants that it will have all states listed above, registered no later than March 1, 2006. Additional states will be registered as requested by Consultant.

The parties agree that, with the exception of the states of New York and Alaska, the Consultant shall have exclusive rights to telephone solicit on behalf of the Client throughout the United States of America for the term of this Agreement.

7.0     Client and/or its representatives will have the right following reasonable notice to Consultant to inspect and audit Consultant's books and records and procedures pertaining to any and all invoices, billings, donations and fees arising out of, relating to or emanating from this Agreement. Such inspection or audit shall take place at Consultant's principal office for the campaign within the United States or in Toronto, Canada. Consultant will cooperate with this audit and provide any and all information requested by the Client's auditors, including, but not limited to a copy of Consultant's SAS-70 Report. If any such inspection or audit indicates that Client has overpaid any charges or billings under this Agreement, Consultant will promptly refund to Client the amount of such overpayment. The provisions of this section will survive termination or expiration of this Agreement for a period of 12 months.

8.0     Each party to this Agreement hereby represents to the other that it is now a validly formed and existing entity with the legal right to conduct its business; that it has the right and authority to enter into this Agreement; and that, upon execution and delivery hereof, this Agreement will constitute a valid and binding obligation upon each such entity, subject to the terms hereof. The persons executing this Agreement on behalf of each such entity represent that they have full right and authority to do so. Each party represents to the other that the execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby require no further action, approval, consent, order or authorization under any corporate charter, certificate of incorporation, resolutions or by-laws.

9.0    This Agreement has been made in the State of New York.  Each of the parties signing this
       Agreement consents to the jurisdiction of the courts in the State of New York.  The rights
       and liabilities of the parties must be determined in accordance with the laws of the State of
       New York without reference to its conflicts of law principles.  Any action or proceeding
       arising out of, relating to or emanating from this Agreement must be commenced and
       maintained in either the Supreme Court of the State of New York, Nassau or Suffolk
       Counties, or the United States District Court, Eastern District of New York.

XENTEL, INC.                                   UNITED BREAST CANCER FOUNDATION

Per: _____                   Per: _____
     David Winograd, President                      Stephanie Mastroianni
                                                    Title: _President_
Date: __8·29·05__ .                                 Date: __8|24|05__

                                                Per: _Mary E. Hm_____
                                                    Name: _MARY E. HEIM_____
                                                    Title: _Secretary_____
                                                    Date: _9/2/05_____

                                                    MARC SZCZUROWSKI
                                                    Notary Public, State of New York
                                                    No. 01SZ6110350
                                                    Qualified in Suffolk County
                                                    Commission Expires May 24, 2008

SCHEDULE "C" attached to and forming part of an Agreement dated
August 22, 2005, between
Xentel, Inc. ("Consultant") and
United Breast Cancer Foundation ("Client")

WHEREAS, Consultant and Client are parties to a certain agreement dated August 22, 2005, and WHEREAS, in order to effect registration in compliance with the laws of the states listed below and for that portion of the contract where activities will be conducted in the states listed below an addendum is required.

WITNESSETH

FOR AND IN CONSIDERATION of the mutual covenants herein contained, the sufficiency of which is acknowledged as evidenced by the signatures of the parties hereto, it is mutually agreed as follows:

1. In order to comply with various state statutes, the following shall be included as terms of the agreement for the various states.

   a. For purposes of the State of Indiana only, the following shall apply:
   Client shall receive as a result of this solicitation campaign twenty (20%) of gross revenue, or the amount set forth in the main Agreement, dated August 22, 2005, whichever is greater. This is an estimated percentage based upon the experience of similar campaigns conducted by Consultant. This shall not affect compensation provisions as listed in the main Agreement.
   The average percentage of gross contributions received by sponsoring organizations as a result of campaigns conducted by Consultant in the three years preceding this agreement is ten percent (10%).

   b. For purposes of the State of Connecticut only, the following shall apply:
   Client shall receive as a result of this solicitation campaign twenty (20%) of gross revenue, or the amount set forth in the main Agreement, dated August 22, 2005, whichever is greater. This is an estimated percentage based upon the experience of similar campaigns conducted by Consultant. This shall not affect compensation provisions as listed in the main Agreement.

   c. For the purposes of the State of Mississippi, the following shall apply:
   Solicitation activity is to commence on October 1, 2005 within the State of Mississippi or ten working days after the contract is received by the Office of the Secretary of State.
   All oral and written presentations to be used by Consultant (and material changes thereto), shall have been reduced to a writing and shall have been reviewed and approved by client.
   Solicitation activity and the contract will terminate on September 30, 2010, within the State of Mississippi.

d.  For the purposes of the State of Pennsylvania, the following shall apply:

Guarantee to Client:  Client shall receive as a result of this solicitation campaign, a minimum guarantee of twenty (20%) of gross revenue.  This shall not affect or alter compensation provisions as listed in the main Agreement dated August 22, 2005.

Percentage to Professional Solicitor.  Client agrees that Consultant shall be compensated pursuant to the terms of the agreement which is estimated to be 80% of gross revenue. This estimated percentage is based on projected figures for average pledge amount participation percentage and fulfillment percentage.  While every project varies in results and yield, this assumption is based on industry standards.  This shall not affect or alter compensation provisions listed in the main Agreement dated August 22, 2005.

Solicitation activity is to commence on October  1, 2005 within the Commonwealth of Pennsylvania or ten working days after the Solicitation Notice is received by the Department of State, Bureau of Charitable Organizations and/or is approved by the Department of State Bureau of Charitable Solicitations.

Solicitation activity and the contract will terminate on September 30, 2010 within the Commonwealth of Pennsylvania.

e.  For the purposes of the State of Oregon, the following shall apply:

Client shall receive as a result of this solicitation campaign twenty (20%) of gross revenue, or the amount set forth in the main Agreement, dated August 22, 2005, whichever is greater.  This estimated percentage is based on projected figures for average pledge amount participation percentage and fulfillment percentage.  While every project varies in results and yield, this assumption is based on industry standards. This shall not affect or alter compensation provisions listed in the main Agreement dated August 22, 2005. This shall not affect compensation provisions as listed in the main Agreement.  The actual percentage going to Client shall not be less than the estimated percentage minus ten percent of the gross revenue.

The name and address of each person pledging to contribute, together with the date and amount of the pledge, shall be the sole exclusive property of the Client with no rights to transfer, sell, rent, or otherwise cause same to be used except by  Client.

f.  For the purposes of the State of New Hampshire, the following shall apply:

All customer lists acquired in the State of New Hampshire along with the names, addresses, date and pledge amount of all sales shall be the sole exclusive property of the Client with no rights to transfer, sell, rent, or otherwise cause same to be used except by the Client.

Client shall receive as a result of this solicitation campaign twenty (20%) of gross revenue, or the amount set forth in the main Agreement, dated August 22, 2005, whichever is greater.  This estimated percentage is based on projected figures for average pledge amount participation percentage and fulfillment percentage.  While every project varies in results and yield, this assumption is based on industry standards. This shall not affect or alter compensation provisions listed in the main Agreement dated August 22, 2005. This shall not affect compensation provisions as listed in the main Agreement.  The actual percentage going to the Client shall not be less than the estimated percentage minus ten percent of the gross revenue.

g.  For the purposes of the State of South Carolina, the following shall apply:

Solicitation activity is to commence on November 1, 2005 within the State of South Carolina or ten working days after the contract is received by the Office of the Secretary of State.

All oral and written presentations to be used by Consultant (and material changes thereto), shall have been reduced to a writing and shall have been reviewed and approved by client.

Solicitation activity and the contract will terminate on September 30, 2010, within the State of South Carolina.  Oral solicitations will be conducted from 1061 Main Street #2D31, North Huntingdon, PA 15642.  Regional Supervisor – Matt McFall, Branch Manager – John Baemmert.

h.  For the purposes of the State of Illinois, the following shall apply:

Consultant shall bear all costs and expenses the telephone solicitation campaign. Expenses shall include but are not limited to (stated as estimated percentage of gross receipts): Payroll ~38%; Branch office expenses ~9%; Corporate office expenses~11%; Printing ~5%; Postage~4%; Telephone~10%; Xentel, Inc.~7%.

i.  For the purposes of the State of Ohio, the following shall apply:

Client shall receive as a result of this solicitation campaign twenty (20%) of gross revenue, or the amount set forth in the main Agreement, dated August 22, 2005, whichever is greater.  This estimated percentage is based on projected figures for average pledge amount participation percentage and fulfillment percentage.  While every project varies in results and yield, this assumption is based on industry standards. This shall not affect or alter compensation provisions listed in the main Agreement dated August 22, 2005. This shall not affect compensation provisions as listed in the main Agreement.  The actual percentage going to the Client shall not be less than the ninety (90%) percent of the reasonable estimated percentage.

j.  For the purpose of the State of New Jersey, the following shall apply:

All revenues resulting from this Agreement shall be collected by XI on behalf of the Client.

All of said revenues shall be delivered timely by Consultant to the Client for immediate deposit, within two (2) days of receipt, into an account under the Client's sole ownership and control. Chase Bank , 111 East Wisconsin Avenue, Milwaukee, WI 53202 Account #_____.

k.  For the purposes of the State of New Mexico, the following shall apply:

Guarantee to Client:  The minimum percentage of gross receipts from the charitable solicitations that will be used by the Client exclusively to advance its charitable purpose is twenty (20%).  This shall not affect or alter compensation provisions as listed in the main Agreement dated August 22, 2005.

All of said revenues shall be delivered timely by Consultant to the Client for immediate deposit, within two (2) days of receipt, into an account under the Client's sole ownership and control.

Oral solicitations will be conducted from 1061 Main Street #2D31, North Huntingdon, PA 15642.  Regional Supervisor – Matt McFall, Branch Manager – John Baemmert.

1.  For the purposes of the State of Washington, the following shall apply:

Client shall receive as a result of this solicitation campaign twenty (20%) of gross revenue, or the amount set forth in the main Agreement, dated August 22, 2005, whichever is greater.  This estimated percentage is based on projected figures for average pledge amount participation percentage and fulfillment percentage.  While every project varies in results and yield, this assumption is based on industry standards.  This shall not affect or alter compensation provisions listed in the main Agreement dated August 22, 2005. This shall not affect compensation provisions as listed in the main Agreement.  The actual percentage going to the Client shall not be less than the estimated percentage minus ten percent of the gross revenue.

IN WITNESS WHEREOF, the parties hereunto affixed their hands on this _24_ day of _August_, 2005.

XENTEL INC.

By: _____
David Winograd, President

Witness _____

UNITED BREAST CANCER FOUNDATION

By: _____
Stephanie Mastroianni, _President_

Witness _____

MARC SZCZUROWSKI
Notary Public, State of New York
No. 01SZ6110350
Qualified in Suffolk County
Commission Expires May 24, 2008

By: _____
MARY E. HEIM (Sec.)/ Treas.

*CHAR016A*

**Professional Fund Raiser/Fund**
**Raising Counsel Contract Certification**
**(Section 173-a(1) Article 7-A**
**of the Executive Law)**

STATE OF NEW YORK
DEPARTMENT OF LAW
CHARITIES BUREAU
THE CAPITOL
ALBANY, NY 12224
www.oag.state.ny.us/charities/charities.html

**INSTRUCTIONS:** A Professional Fund Raiser (PFR) or Fund Raising Counsel (FRC) must file with the Charities Bureau, within ten days of its execution, a copy of each contract the PFR or FRC enters into with any charitable organization required to be registered under NYS Executive Law §172. At the time of filing, the PFR or FRC must certify, under penalties for perjury, that the contract being filed is a true and correct copy of the original executed contract. This certification form may be used by a PFR or FRC when submitting a contract. A PFR or FRC is not required to use this specific form as long as its certification is substantially similar to this form.

Each contract required to be filed with the Charities Bureau must contain (a) the names, addresses and NYS Charities Bureau identification numbers of all parties to the contract; (b) a specific beginning and ending date for the contract; (c) a clear narrative description of the services to be performed by the PFR or FRC; (d) a clear statement of the financial arrangement between the charitable organization and the PFR or FRC; (e) signatures and dates of signature of all parties to the contract and (f) a statement of the charitable organization's statutory right to cancel the contract; the period during which the contract may be canceled; the address to which the notice of cancellation must be sent and the address of the Office of the Attorney General to which a duplicate must be sent. (Please refer to the reverse side of this form.) In addition, §173-a(2) of NYS Executive Law specifies that every contract between a PFR and a charitable organization shall contain, or shall be deemed to contain, a provision that within 5 days of receipt by the PFR or other person, the gross revenue received from a solicitation conducted by that PFR shall be deposited in a bank account under the exclusive control of the charitable organization. Please note that §172-d(5) of NYS Executive Law requires that prior to entering into a contract with a charitable organization, a PFR or FRC must provide that charitable organization with a statement, signed under penalties for perjury, that it is registered and in compliance with all filing requirements of the Executive Law. Section 172-d(6) of NYS Executive Law prohibits a PFR or FRC from entering into any contract, agreement, employment or engagement to raise funds or conduct any fund raising activities for any charitable organization required to be registered unless the charitable organization is registered and in compliance with all filing requirements.

**CONTRACT CERTIFICATION FOR PROFESSIONAL FUND RAISERS & FUND RAISING COUNSEL**

Name of Contracting Professional Fund Raiser or Fund Raising Counsel: Xentel, Inc.

Name of Contracting Charitable Organization(s): United Breast Cancer Foundation

Date of Contract: August 22, 2005

I, AN AUTHORIZED REPRESENTATIVE OF THE ABOVE NAMED PROFESSIONAL FUND RAISER OR FUND RAISING COUNSEL, CERTIFY UNDER PENALTIES FOR PERJURY, THAT THE ABOVE REFERENCED AND ATTACHED CONTRACT, INCLUDING ANY ACCOMPANYING EXHIBITS, ADDENDA AND ATTACHMENTS, IS A TRUE AND CORRECT COPY OF THE ORIGINAL CONTRACT EXECUTED BY THE PARTIES.

x _Donna M. Wagoner_ 
Signature of Authorized Representative of PFR/FRC

Donna M. Wagoner, Registrar
Title of Authorized Representative

Date

**FOR CHARITIES BUREAU OFFICE USE ONLY. DO NOT ENTER INFORMATION IN THIS SPACE.**

Charity I.D. #: _____     Contract Type: _____

Received: _____   Signed: __/__/__   Filed: __/__/__   Closing Statement Due: __/__/__

Contract Period: _____

_____

Terms: _____

_____

**CHAR016B**

**Addendum To Contract
With Charitable Organizations**
*(Section 174-a Article 7-A
of the Executive Law)*

STATE OF NEW YORK
DEPARTMENT OF LAW
CHARITIES BUREAU
THE CAPITOL
ALBANY, NY 12224
www.oag.state.ny.us/charities/charities.html

**INSTRUCTIONS:** A Professional Fund Raiser (PFR) or Fund Raising Counsel (FRC) is required to insure that its contracts comply with §174-a of NYS Executive Law. This addendum may be used by a PFR or FRC when a contract required to be filed with the Charities Bureau by the PFR or FRC does not already conform to §174-a. The provisions of this addendum shall be accepted as complying with §174-a. If a PFR or FRC elects to use this form, the addendum must be completed and signed by all parties to the contract and must be attached to the contract when it is filed with the Charities Bureau. A PFR or FRC is not required to use this specific form. The Charities Bureau encourages professional fund raisers and fund raising counsel to execute contracts that initially comply with §174-a.

The parties to the attached contract are  United Breast Cancer Foundation
*(Name of Charitable Organization Per Contract )*

and  Xentel, Inc
*(Name of Professional Fund Raiser or Fund Raising Counsel Per Contract)*

The parties acknowledge that the attached contract was signed by the charitable organization on _____,
20 05 , and by the professional fund raiser or fund raising counsel on _____, 20 05 .

The parties agree that the provisions of this addendum shall be made part of the contract and shall be incorporated therein as if fully set forth in the contract itself. The parties further agree that the following terms and conditions shall supercede and control any provisions in the contract that are contrary to or inconsistent with the terms of this addendum. Therefore, the parties further agree as follows:

**(1) Charity's right to cancel this contract:** It is understood by the parties that the charitable organization has the right under New York State law to cancel this contract and that the charitable organization is not required to give any reason for the cancellation. By law, the parties to this contract cannot waive or modify this right by any pre-existing agreement or by any subsequent agreement between the parties. Therefore, the charitable organization may cancel this contract without cost, penalty or liability if the charitable organization notifies the professional fund raiser or fund raising counsel in writing as provided below.

**(2) Period during which contract may be cancelled:** If the professional fund raiser or fund raising counsel is registered with the New York State Charities Bureau, the charitable organization may cancel this contract at any time up to and including the fifteenth day after this contract was filed by the professional fund raiser or fund raising counsel with the New York State Charities Bureau, regardless of the execution date of the contract. If, however, the professional fund raiser is not registered with the New York State Charities Bureau at the time this contract is signed, the charitable organization may cancel this contract at any time after it is signed.

**(3) Procedure for cancelling this contract:** The charitable organization may cancel this contract by giving the professional fund raiser or fund raising counsel written notice of cancellation. This notice may be in the form of a letter stating that the charitable organization does not intend to be bound by the contract. The notice of cancellation may be hand-delivered or mailed to the professional fund raiser or fund raising counsel. If mailed, it must be sent to the professional fund raiser or fund raising counsel at the following address:
Xentel, Inc. 101 NE 3rd Avenue, Suite #201, Ft. Lauderdale, Florida 33301-1104
*(Name and Complete Mailing Address of Professional Fund Raiser or Fund Raising Counsel)*
The charitable organization must also mail a copy of the notice of cancellation to the State of New York, Office of the Attorney General, Charities Bureau, The Capitol, Albany, NY 12224.

**(4) When the cancellation is effective:** If the notice of cancellation is hand-delivered, the cancellation is effective as soon as it is delivered to the professional fund raiser or fund raising counsel. If the notice of cancellation is mailed, the cancellation is effective as soon as the notice is deposited, properly addressed and postage pre-paid, in a mailbox.

**(5) Financial arrangement:** The parties further agree to the following financial arrangement: *(Enter "NA" if the contract contains a clear statement of the financial arrangement.)*

In witness of their acceptance of the provisions contained in this addendum, the parties have signed this addendum on the dates set forth below.

Professional Fund Raiser/Fund Raising Counsel:

| Signature | Date |
|---|---|
|  | 8-25-05 |

David Winograd — President
Print or type name — Title

Charitable Organization:

| Signature | Date |
|---|---|
|  | 8/26/05 |

Stephanie Mastroianni — President
Print or type name — Title

# UNITED BREAST CANCER FOUNDATION
## IS REGISTERED IN THE FOLLOWING STATES
STATES THAT DO NOT ASSIGN REGISTRATION NUMBERS USE YOUR FEDERAL TAX I.D. NUMBER
FOR IDENTIFICATION.

| STATE | | REGISTRATION NUMBER |
|---|---|---|
| ALABAMA | | |
| ALASKA | fed tax id # | |
| ARIZONA | | |
| ARKANSAS | fed tax id # | |
| CALIFORNIA | | |
| LOS ANGELES, CALIFORNIA | | |
| COLORADO | | |
| CONNECTICUT | | |
| DELAWARE | | NOT REQUIRED BY CHARITY |
| DISTRICT OF COLUMBIA | | |
| FLORIDA | | |
| PINELLAS COUNTY, FLORIDA | | |
| GEORGIA | | |
| HAWAII | | NOT REQUIRED BY CHARITY |
| IDAHO | | NOT REQUIRED BY CHARITY |
| ILLINOIS | | |
| INDIANA | | NOT REQUIRED BY CHARITY |
| IOWA | | NOT REQUIRED BY CHARITY |
| KANSAS | | |
| KENTUCKY | | |
| LOUISVILLE, KENTUCKY | | |
| LOUISIANA | fed tax id # | |
| MASSACHUCETTS | | |
| MARYLAND | | |
| MAINE | | |
| MICHIGAN | | |
| MINNESOTA | fed tax id # | |
| MISSISSIPPI | | |
| MISSOURI | | 501 (C) 3 ORGANIZATIONS EXEMPT |
| MONTANA | | NOT REQUIRED BY CHARITY |
| NEBRASKA | | NOT REQUIRED BY CHARITY |
| NEVADA | | NOT REQUIRED BY CHARITY |
| NEW HAMPSHIRE | | |
| NEW JERSEY | | |
| NEW MEXICO | fed tax id # | |
| NEW YORK | | |
| NORTH CAROLINA | | |
| NORTH DAKOTA | | |
| OHIO | | |
| OKLAHOMA | fed tax id # | |
| OREGON | | |
| PENNSYLVANIA | | |
| RHODE ISLAND | fed tax id # | |
| SOUTH CAROLINA | | |
| SOUTH DAKOTA | | NOT REQUIRED BY CHARITY |
| TENNESSEE | | |
| TEXAS | | 501(C)3 ORGANIZATIONS EXEMPT |
| UTAH | | |
| VIRGINIA | fed tax id # | |
| WASHINGTON | | |
| WEST VIRGINIA | fed tax id # | |
| WISCONSIN | | |

AMERICAN ARBITRATION ASSOCIATION          AAA Case No. 13-193-00882-10

XENTEL, INC./COURTESY HEALTH WATCH, INC.,

        Claimant,

    -against-

UNITED BREAST CANCER FOUNDATION,

        Respondent.

## RESPONDENT'S ANSWERING STATEMENT WITH AFFIRMATIVE DEFENSES AND COUNTERCLAIM

### JOHN G. POLI, III, P.C.
*Attorney for Respondent*
*Office and Post Office Address, Telephone*
**P.O. BOX 59**
**NORTHPORT, NY 11768**
**(631) 262-9696**

To:                                        Signature (Rule 130-1.1-a)
    **Attorneys for**

                                 JOHN G. POLI, III, ESQ.

Service of a copy of the within                    is hereby admitted.

Dated,

                                   Attorney(s) for

Sir: - Please take notice

\_\_\_  **Notice of Entry**
that the within is a *(certified)* true copy of a
duly entered in the office of the clerk of the within named court on          19

\_\_\_  **Notice of Settlement**
that an order                              of which the within is a true copy will be presented for settlement to
the Hon.                                   on of the judgment of the within named court, at
on               19      at           M.
Dated,

                        Yours, etc.

                        JOHN G. POLI, III, P.C.
                        *Attorney for Respondent*
                        *Office and Post Office Address*
                        P.O. Box 59
                        Northport, NY 11768

5

Search ⊕

ABOUT US          DISPUTE RESOLUTION SERVICES          FILE A CASE          AAA UNIVERSITY          NEUTRALS

CONTACT US

PRINT VERSION

## Commercial Arbitration Rules and Mediation PROCEDURES

(Including Procedures for Large, Complex Commercial Disputes)
Rules Amended and Effective June 1, 2009
Fee Schedule Amended and Effective June 1, 2010

To access the AAA Commercial Arbitration Rules and Mediation Procedures with the previous versions of Fee Schedules, visit the
Archived Rules area of the site -- click here.

TABLE OF CONTENTS

IMPORTANT NOTICE
INTRODUCTION
STANDARD ARBITRATION CLAUSE
ADMINISTRATIVE FEES
MEDIATION
LARGE, COMPLEX CASES

COMMERCIAL MEDIATION PROCEDURES
M-1. Agreement of Parties
M-2. Initiation of Mediation
M-3. Representation
M-4. Appointment of the Mediator
M-5. Mediator's Impartiality and Duty to Disclose
M-6. Vacancies
M-7. Date and Responsibilities of the Mediator
M-8. Responsibilities of the Parties
M-9. Privacy
M-10. Confidentiality
M-11. No Stenographic Record
M-12. Termination of Mediation
M-13. Exclusion of Liability
M-14. Interpretation and Application of Procedures
M-15. Deposits
M-16. Expenses

M-17. Cost of Mediation

COMMERCIAL ARBITRATION RULES
R-1. Agreement of Parties
R-2. AAA and Delegation of Duties
R-3. National Roster of Arbitrators
R-4. Initiation under an Arbitration Provision in a Contract
R-5. Initiation under a Submission
R-6. Changes of Claim
R-7. Jurisdiction
R-8. Mediation

R-9. Administrative Conference
R-10. Fixing of Locale
R-11. Appointment from National Roster
R-12. Direct Appointment by a Party
R-13. Appointment of Chairperson by Party-Appointed Arbitrators or Parties
R-14. Nationality of Arbitrator
R-15. Number of Arbitrators
R-16. Disclosure
R-17. Disqualification of Arbitrator
R-18. Communication with Arbitrator
R-19. Vacancies
R-20. Preliminary Hearing
R-21. Exchange of Information
R-22. Date, Time, and Place of Hearing
R-23. Attendance at Hearings
R-24. Representation
R-25. Oaths
R-26. Stenographic Record
R-27. Interpreters
R-28. Postponements
R-29. Arbitration in the Absence of a Party or Representative
R-30. Conduct of Proceedings
R-31. Evidence
R-32. Evidence by Affidavit and Post-hearing Filing of Documents or Other Evidence
R-33. Inspection or Investigation
R-34. Interim Measures
R-35. Closing of Hearing
R-36. Reopening of Hearing
R-37. Waiver of Rules
R-38. Extensions of Time
R-39. Serving of Notice
R-40. Majority Decision
R-41. Time of Award
R-42. Form of Award
R-43. Scope of Award
R-44. Award upon Settlement
R-45. Delivery of Award to Parties
R-46. Modification of Award
R-47. Release of Documents for Judicial Proceedings
R-48. Applications to Court and Exclusion of Liability
R-49. Administrative Fees
R-50. Expenses
R-51. Neutral Arbitrator's Compensation
R-52. Deposits
R-53. Interpretation and Application of Rules
R-54. Suspension for Nonpayment

EXPEDITED PROCEDURES
E-1. Limitation on Extensions
E-2. Changes of Claim or Counterclaim
E-3. Serving of Notices

E-4. Appointment and Qualifications of Arbitrator
E-5. Exchange of Exhibits
E-6. Proceedings on Documents
E-7. Date, Time, and Place of Hearing
E-8. The Hearing
E-9. Time of Award
E-10. Arbitrator's Compensation

PROCEDURES FOR LARGE, COMPLEX COMMERCIAL DISPUTES
L-1. Administrative Conference
L-2. Arbitrators
L-3. Preliminary Hearing
L-4. Management of Proceedings

OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION
O-1. Applicability
O-2. Appointment of Emergency Arbitrator
O-3. Schedule
O-4. Interim Award
O-5. Constitution of the Panel
O-6. Security
O-7. Special Master
O-8. Costs

ADMINISTRATIVE FEES
Standard Fee Schedule
Flexible Fee Schedule
Hearing Room Rental

**IMPORTANT NOTICE**

These rules and any amendment of them shall apply in the form in effect at the time the administrative filing requirements are met for a demand for arbitration or submission agreement received by the AAA. To ensure that you have the most current information, see our web site at www.adr.org.

**INTRODUCTION**

Each year, many millions of business transactions take place. Occasionally, disagreements develop over these business transactions. Many of these disputes are resolved by arbitration, the voluntary submission of a dispute to an impartial person or persons for final and binding determination. Arbitration has proven to be an effective way to resolve these disputes privately, promptly, and economically.

The American Arbitration Association (AAA), a not-for-profit, public service organization, offers a broad range of dispute resolution services to business executives, attorneys, individuals, trade associations, unions, management, consumers, families, communities, and all levels of government. Services are available through AAA headquarters in New York and through offices located in major cities throughout the United States. Hearings may be held at locations convenient for the parties and are not limited to cities with AAA offices. In addition, the AAA serves as a center for education and training, issues specialized publications, and conducts research on all forms of out -of-court dispute settlement.

Standard Arbitration Clause

The parties can provide for arbitration of future disputes by inserting the following clause into their contracts:

*Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.*

Arbitration of existing disputes may be accomplished by use of the following:

*We, the undersigned parties, hereby agree to submit to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules the following controversy: (describe briefly) We further agree that the above controversy be submitted to (one) (three) arbitrator(s). We further agree that we will faithfully observe this agreement and the rules, that we will abide by and perform any award rendered by the arbitrator(s), and that a judgment of any court having jurisdiction may be entered on the award.*

In transactions likely to require emergency interim relief, the parties may wish to add to their clause the following language:

*The parties also agree that the AAA Optional Rules for Emergency Measures of Protection shall apply to the proceedings.*

These Optional Rules may be found below.

The services of the AAA are generally concluded with the transmittal of the award. Although there is voluntary compliance with the majority of awards, judgment on the award can be entered in a court having appropriate jurisdiction if necessary.

Administrative Fees

The AAA charges a filing fee based on the amount of the claim or counterclaim. This fee information, which is included with these rules, allows the parties to exercise control over their administrative fees.

The fees cover AAA administrative services; they do not cover arbitrator compensation or expenses, if any, reporting services, or any post-award charges incurred by the parties in enforcing the award.

Mediation

The parties might wish to submit their dispute to mediation prior to arbitration. In mediation, the neutral mediator assists the parties in reaching a settlement but does not have the authority to make a binding decision or award. Mediation is administered by the AAA in accordance with its Commercial Mediation Procedures. There is no additional administrative fee where parties to a pending arbitration attempt to mediate their dispute under the AAA's auspices.

If the parties want to adopt mediation as a part of their contractual dispute settlement procedure, they can insert the following mediation clause into their contract in conjunction with a standard arbitration provision:

*If a dispute arises out of or relates to this contract, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration, litigation, or some other dispute resolution procedure.*

If the parties want to use a mediator to resolve an existing dispute, they can enter into the following submission:

*The parties hereby submit the following dispute to mediation administered by the American Arbitration Association under its Commercial Mediation Procedures. (The clause may also provide for the qualifications of the mediator(s), method of payment, locale of meetings, and any other item of concern to the parties.)*

Large, Complex Cases

Unless the parties agree otherwise, the procedures for Large, Complex Commercial Disputes, which appear in this pamphlet, will be applied to all cases administered by the AAA under the Commercial Arbitration Rules in which the disclosed claim or counterclaim of any party is at least $500,000 exclusive of claimed interest, arbitration fees and costs.

The key features of these procedures include:

- a highly qualified, trained Roster of Neutrals;
- a mandatory preliminary hearing with the arbitrators, which may be conducted by teleconference;
- broad arbitrator authority to order and control discovery, including depositions;
- presumption that hearings will proceed on a consecutive or block basis.

COMMERCIAL MEDIATION PROCEDURES

M-1. Agreement of Parties

Whenever, by stipulation or in their contract, the parties have provided for mediation or conciliation of existing or future disputes under the auspices of the American Arbitration Association (AAA) or under these procedures, the parties and their representatives, unless agreed otherwise in writing, shall be deemed to have made these procedural guidelines, as amended and in effect as of the date of filing of a request for mediation, a part of their agreement and designate the AAA as the administrator of their mediation.

The parties by mutual agreement may vary any part of these procedures including, but not limited to, agreeing to conduct the mediation via telephone or other electronic or technical means.

#### M-2. Initiation of Mediation

Any party or parties to a dispute may initiate mediation under the AAA's auspices by making a request for mediation to any of the AAA's regional offices or case management centers via telephone, email, regular mail or fax. Requests for mediation may also be filed online via WebFile at www.adr.org.

The party initiating the mediation shall simultaneously notify the other party or parties of the request. The initiating party shall provide the following information to the AAA and the other party or parties as applicable:

    i. A copy of the mediation provision of the parties' contract or the parties' stipulation to mediate.
    ii. The names, regular mail addresses, email addresses, and telephone numbers of all parties to the dispute and representatives, if any, in the mediation.
    iii. A brief statement of the nature of the dispute and the relief requested.
    iv. Any specific qualifications the mediator should possess.

Where there is no preexisting stipulation or contract by which the parties have provided for mediation of existing or future disputes under the auspices of the AAA, a party may request the AAA to invite another party to participate in "mediation by voluntary submission". Upon receipt of such a request, the AAA will contact the other party or parties involved in the dispute and attempt to obtain a submission to mediation.

#### M-3. Representation

Subject to any applicable law, any party may be represented by persons of the party's choice. The names and addresses of such persons shall be communicated in writing to all parties and to the AAA.

#### M-4. Appointment of the Mediator

Parties may search the online profiles of the AAA's Panel of Mediators at www.aaamediation.com in an effort to agree on a mediator. If the parties have not agreed to the appointment of a mediator and have not provided any other method of appointment, the mediator shall be appointed in the following manner:

    i. Upon receipt of a request for mediation, the AAA will send to each party a list of mediators from the AAA's Panel of Mediators. The parties are encouraged to agree to a mediator from the submitted list and to advise the AAA of their agreement.
    ii. If the parties are unable to agree upon a mediator, each party shall strike unacceptable names from the list, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all mediators on the list shall be deemed acceptable. From among the mediators who have been mutually approved by the parties, and in accordance with the designated order of mutual preference, the AAA shall invite a mediator to serve.
    iii. If the parties fail to agree on any of the mediators listed, or if acceptable mediators are unable to serve, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the authority to make the appointment from among other members of the Panel of Mediators without the submission of additional lists.

#### M-5. Mediator's Impartiality and Duty to Disclose

AAA mediators are required to abide by the Model Standards of Conduct for Mediators in effect at the time a mediator is appointed to a case. Where there is a conflict between the Model Standards and any provision of these Mediation Procedures, these Mediation Procedures shall govern. The Standards require mediators to (i) decline a mediation if the mediator cannot conduct it in an impartial manner, and (ii) disclose, as soon as practicable, all actual and potential conflicts of interest that are reasonably known to the mediator and could reasonably be seen as raising a question about the mediator's impartiality.

Prior to accepting an appointment, AAA mediators are required to make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest for the mediator. AAA mediators are required to disclose any circumstance likely to create a presumption of bias or prevent a resolution of the parties' dispute within the time-frame desired by the parties. Upon receipt of such disclosures, the AAA shall immediately communicate the disclosures to the parties for their comments.

The parties may, upon receiving disclosure of actual or potential conflicts of interest of the mediator, waive such conflicts and proceed with the mediation. In the event that a party disagrees as to whether the mediator shall serve, or in the event that the mediator's conflict of interest might reasonably be viewed as undermining the integrity of the mediation, the mediator shall be replaced.

#### M-6. Vacancies

If any mediator shall become unwilling or unable to serve, the AAA will appoint another mediator, unless the parties agree otherwise, in accordance with section M-4.

#### M-7. Duties and Responsibilities of the Mediator

i. The mediator shall conduct the mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.

ii. The mediator is authorized to conduct separate or ex parte meetings and other communications with the parties and/or their representatives, before, during, and after any scheduled mediation conference. Such communications may be conducted via telephone, in writing, via email, online, in person or otherwise.

iii. The parties are encouraged to exchange all documents pertinent to the relief requested. The mediator may request the exchange of memoranda on issues, including the underlying interests and the history of the parties' negotiations. Information that a party wishes to keep confidential may be sent to the mediator, as necessary, in a separate communication with the mediator.

iv. The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. Subject to the discretion of the mediator, the mediator may make oral or written recommendations for settlement to a party privately or, if the parties agree, to all parties jointly.

v. In the event a complete settlement of all or some issues in dispute is not achieved within the scheduled mediation session(s), the mediator may continue to communicate with the parties, for a period of time, in an ongoing effort to facilitate a complete settlement.

vi. The mediator is not a legal representative of any party and has no fiduciary duty to any party.

## M-8. Responsibilities of the Parties

The parties shall ensure that appropriate representatives of each party, having authority to consummate a settlement, attend the mediation conference.

Prior to and during the scheduled mediation conference session(s) the parties and their representatives shall, as appropriate to each party's circumstances, exercise their best efforts to prepare for and engage in a meaningful and productive mediation.

## M-9. Privacy

Mediation sessions and related mediation communications are private proceedings. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

M-10. Confidentiality

Subject to applicable law or the parties' agreement, confidential information disclosed to a mediator by the parties or by other participants (witnesses) in the course of the mediation shall not be divulged by the mediator. The mediator shall maintain the confidentiality of all information obtained in the mediation, and all records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding the following, unless agreed to by the parties or required by applicable law:

i. Views expressed or suggestions made by a party or other participant with respect to a possible settlement of the dispute;

ii. Admissions made by a party or other participant in the course of the mediation proceedings;

iii. Proposals made or views expressed by the mediator; or

iv. The fact that a party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

M-11. No Stenographic Record

There shall be no stenographic record of the mediation process.

M-12. Termination of Mediation

The mediation shall be terminated:

i. By the execution of a settlement agreement by the parties; or

ii. By a written or verbal declaration of the mediator to the effect that further efforts at mediation would not contribute to a resolution of the parties' dispute; or

iii. By a written or verbal declaration of all parties to the effect that the mediation proceedings are terminated; or

iv. When there has been no communication between the mediator and any party or party's representative for 21 days following the conclusion of the mediation conference.

M-13. Exclusion of Liability

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the AAA nor any mediator shall be liable to any party for any error, act or omission in connection with any mediation conducted under these procedures.

M-14. Interpretation and Application of Procedures

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the AAA.

M-15. Deposits

Unless otherwise directed by the mediator, the AAA will require the parties to deposit in advance of the mediation conference such sums of money as it, in consultation with the mediator, deems necessary to cover the costs and expenses of the mediation and shall render an accounting to the parties and return any unexpended balance at the conclusion of the mediation.

M-16. Expenses

All expenses of the mediation, including required traveling and other expenses or charges of the mediator, shall be borne equally by the parties unless they agree otherwise. The expenses of participants for either side shall be paid by the party requesting the attendance of such participants.

M-17. Cost of the Mediation

There is no filing fee to initiate a mediation or a fee to request the AAA to invite parties to mediate.

The cost of mediation is based on the hourly mediation rate published on the mediator's AAA profile.  This rate covers both mediator compensation and an allocated portion for the AAA's services.  There is a four-hour minimum charge for a mediation conference. Expenses referenced in Section M-16 may also apply.

If a matter submitted for mediation is withdrawn or cancelled or results in a settlement after the agreement to mediate is filed but prior to the mediation conference the cost is $250 plus any mediator time and charges incurred.

The parties will be billed equally for all costs unless they agree otherwise.

If you have questions about mediation costs or services visit our website at www.adr.org or contact your local AAA office.

Conference Room Rental

The costs described above do not include the use of AAA conference rooms. Conference rooms are available on a rental basis. Please contact your local AAA office for availability and rates.

COMMERCIAL ARBITRATION RULES

R-1. Agreement of Parties*+

(a) The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a demand for arbitration or submission agreement received by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

(b) Unless the parties or the AAA determines otherwise, the Expedited Procedures shall apply in any case in which no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration fees and costs. Parties may also agree to use these procedures in larger cases. Unless the parties agree otherwise, these procedures will not apply in cases involving more than two parties. The Expedited Procedures shall be applied as described in Sections E-1 through E-10 of these rules, in addition to any other portion of these rules that is not in conflict with the Expedited Procedures.

(c) Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $500,000, exclusive of claimed interest, arbitration fees and costs. Parties may also agree to use the Procedures in cases involving claims or counterclaims under $500,000, or in nonmonetary cases. The Procedures for Large, Complex Commercial Disputes shall be applied as described in Sections L-1 through L-4 of these rules, in addition to any other portion of these rules that is not in conflict with the Procedures for Large, Complex Commercial Disputes.

(d) All other cases shall be administered in accordance with Sections R-1 through R-54 of these rules.

* The AAA applies the *Supplementary Procedures for Consumer-Related Disputes* to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are nonnegotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to

bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

+ A dispute arising out of an employer promulgated plan will be administered under the AAA's Employment Arbitration Rules and Mediation Procedures.

R-2. AAA and Delegation of Duties

When parties agree to arbitrate under these rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in the agreement of the parties and in these rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices.

R-3. National Roster of Arbitrators

The AAA shall establish and maintain a National Roster of Commercial Arbitrators ("National Roster") and shall appoint arbitrators as provided in these rules. The term "arbitrator" in these rules refers to the arbitration panel, constituted for a particular case, whether composed of one or more arbitrators, or to an individual arbitrator, as the context requires.

R-4. Initiation under an Arbitration Provision in a Contract

(a) Arbitration under an arbitration provision in a contract shall be initiated in the following manner:

(i) The initiating party (the "claimant") shall, within the time period, if any, specified in the contract(s), give to the other party (the "respondent") written notice of its intention to arbitrate (the "demand"), which demand shall contain a statement setting forth the nature of the dispute, the names and addresses of all other parties, the amount involved, if any, the remedy sought, and the hearing locale requested.

(ii) The claimant shall file at any office of the AAA two copies of the demand and two copies of the arbitration provisions of the contract, together with the appropriate filing fee as provided in the schedule included with these rules.

(iii) The AAA shall confirm notice of such filing to the parties.

(b) A respondent may file an answering statement in duplicate with the AAA within 15 days after confirmation of notice of filing of the demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of the answering statement to the claimant. If a counterclaim is asserted, it shall contain a statement setting forth the nature of the counterclaim, the amount involved, if any, and the remedy sought. If a counterclaim is made, the party making the counterclaim shall forward to the AAA with the answering statement the appropriate fee provided in the schedule included with these rules.

(c) If no answering statement is filed within the stated time, respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

(d) When filing any statement pursuant to this section, the parties are encouraged to provide descriptions of their claims in sufficient detail to make the circumstances of the dispute clear to the arbitrator.

R-5. Initiation under a Submission

Parties to any existing dispute may commence an arbitration under these rules by filing at any office of the AAA two copies of a written submission to arbitrate under these rules, signed by the parties. It shall contain a statement of the nature of the dispute, the names and addresses of all parties, any claims and counterclaims, the amount involved, if any, the remedy sought, and the hearing locale requested, together with the appropriate filing fee as provided in the schedule included with these rules. Unless the parties state otherwise in the submission, all claims and counterclaims will be deemed to be denied by the other party.

R-6. Changes of Claim

After filing of a claim, if either party desires to make any new or different claim or counterclaim, it shall be made in writing and filed with the AAA. The party asserting such a claim or counterclaim shall provide a copy to the other party, who shall have 15 days from the date of such transmission within which to file an answering statement with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

R-7. Jurisdiction

(a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

(b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

(c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

R-8. Mediation

At any stage of the proceedings, the parties may agree to conduct a mediation conference under the Commercial Mediation Procedures in order to facilitate settlement. The mediator shall not be an arbitrator appointed to the case. Where the parties to a pending arbitration agree to mediate under the AAA's rules, no additional administrative fee is required to initiate the mediation.

R-9. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, potential mediation of the dispute, potential exchange of information, a timetable for hearings and any other administrative matters.

R-10. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. If any party requests that the hearing be held in a specific locale and the other party files no objection thereto within 15 days after notice of the request has been sent to it by the AAA, the locale shall be the one requested. If a party objects to the locale requested by the other party, the AAA shall have the power to determine the locale, and its decision shall be final and binding.

R-11. Appointment from National Roster

(a) If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner: The AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

(b) If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 15 days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.

(c) Unless the parties agree otherwise when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

R-12. Direct Appointment by a Party

(a) If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. The notice of appointment, with the name and address of the arbitrator, shall be filed with the AAA by the appointing party. Upon the request of any appointing party, the AAA shall submit a list of members of the National Roster from which the party may, if it so desires, make the appointment.

(b) Where the parties have agreed that each party is to name one arbitrator, the arbitrators so named must meet the standards of Section R-17 with respect to impartiality and independence unless the parties have specifically agreed pursuant to Section R-17(a) that the party-appointed arbitrators are to be non-neutral and need not meet those standards.

(c) If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

(d) If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 15 days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

R-13. Appointment of Chairperson by Party-Appointed Arbitrators or Parties

(a) If, pursuant to Section R-12, either the parties have directly appointed arbitrators, or the arbitrators have been appointed by the AAA, and the parties have authorized them to appoint a chairperson within a specified time and no appointment is made within that time or any agreed extension, the AAA may appoint the chairperson.

(b) If no period of time is specified for appointment of the chairperson and the party-appointed arbitrators or the parties do not make the appointment within 15 days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the chairperson.

(c) If the parties have agreed that their party-appointed arbitrators shall appoint the chairperson from the National Roster, the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Section R-11, a list selected from the National Roster, and the appointment of the chairperson shall be made as provided in that Section.

R-14. Nationality of Arbitrator

Where the parties are nationals of different countries, the AAA, at the request of any party or on its own initiative, may appoint as arbitrator a national of a country other than that of any of the parties. The request must be made before the time set for the appointment of the arbitrator as agreed by the parties or set by these rules.

R-15. Number of Arbitrators

If the arbitration agreement does not specify the number of arbitrators, the dispute shall be heard and determined by one arbitrator, unless the AAA, in its discretion, directs that three arbitrators be appointed. A party may request three arbitrators in the demand or answer, which request the AAA will consider in exercising its discretion regarding the number of arbitrators appointed to the dispute.

R-16. Disclosure

(a) Any person appointed or to be appointed as an arbitrator shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration.

(b) Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

(c) In order to encourage disclosure by arbitrators, disclosure of information pursuant to this Section R-16 is not to be construed as an indication that the arbitrator considers that the disclosed circumstance is likely to affect impartiality or independence.

R-17. Disqualification of Arbitrator

(a) Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for

(i) partiality or lack of independence,

(ii) inability or refusal to perform his or her duties with diligence and in good faith, and

(iii) any grounds for disqualification provided by applicable law. The parties may agree in writing, however, that arbitrators directly appointed by a party pursuant to Section R-12 shall be nonneutral, in which case such arbitrators need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence.

(b) Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified under the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive.

R-18. Communication with Arbitrator

(a) No party and no one acting on behalf of any party shall communicate ex parte with an arbitrator or a candidate for arbitrator concerning the arbitration, except that a party, or someone acting on behalf of a party, may communicate ex parte with a candidate for direct appointment pursuant to Section R-12 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.

(b) Section R-18(a) does not apply to arbitrators directly appointed by the parties who, pursuant to Section R-17(a), the parties have agreed in writing are non-neutral. Where the parties have so agreed under Section R-17(a), the AAA shall as an administrative practice suggest to the parties that they agree further that Section R-18(a) should nonetheless apply prospectively.

R-19. Vacancies

(a) If for any reason an arbitrator is unable to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these rules.

(b) In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

(c) In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

R-20. Preliminary Hearing

(a) At the request of any party or at the discretion of the arbitrator or the AAA, the arbitrator may schedule as soon as practicable a preliminary hearing with the parties and/or their representatives. The preliminary hearing may be conducted by telephone at the arbitrator's discretion.

(b) During the preliminary hearing, the parties and the arbitrator should discuss the future conduct of the case, including clarification of the issues and claims, a schedule for the hearings and any other preliminary matters.

R-21. Exchange of Information

(a) At the request of any party or at the discretion of the arbitrator, consistent with the expedited nature of arbitration, the arbitrator may direct

i) the production of documents and other information, and

ii) the identification of any witnesses to be called.

(b) At least five business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing.

(c) The arbitrator is authorized to resolve any disputes concerning the exchange of information.

R-22. Date, Time, and Place of Hearing

The arbitrator shall set the date, time, and place for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 days in advance of the hearing date, unless otherwise agreed by the parties.

R-23. Attendance at Hearings

The arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person other than a party and its representatives.

R-24. Representation

Any party may be represented by counsel or other authorized representative. A party intending to be so represented shall notify the other party and the AAA of the name and address of the representative at least three days prior to the date set for the hearing at which that person is first to appear. When such a representative initiates an arbitration or responds for a party, notice is deemed to have been given.

R-25. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

R-26. Stenographic Record

Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall notify the other parties of these arrangements at least three days in advance of the hearing. The requesting party or parties shall pay the cost of the record. If the transcript is agreed by the parties, or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties for inspection, at a date, time, and place determined by the arbitrator.

R-27. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

R-28. Postponements

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative.

R-29. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award.

R-30. Conduct of Proceedings

(a) The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. Witnesses for each party shall also submit to questions from the arbitrator and the adverse party. The arbitrator has the discretion to vary this procedure, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

(b) The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

(c) The parties may agree to waive oral hearings in any case.

R-31. Evidence

(a) The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default or has waived the right to be present.

(b) The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

(c) The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

(d) An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

R-32. Evidence by Affidavit and Post-hearing Filing of Documents or Other Evidence

(a) The arbitrator may receive and consider the evidence of witnesses by declaration or affidavit, but shall give it only such weight as the arbitrator deems it entitled to after consideration of any objection made to its admission.

(b) If the parties agree or the arbitrator directs that documents or other evidence be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded an opportunity to examine and respond to such documents or other evidence.

R-33. Inspection or Investigation

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time and the AAA shall notify the parties. Any party who so desires may be present at such an inspection or investigation. In the event that one or all parties are not present at the inspection or investigation, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

R-34. Interim Measures**

(a) The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

(b) Such interim measures may take the form of an interim award, and the arbitrator may require security for the costs of such measures.

(c) A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

** The Optional Rules may be found below.

R-35. Closing of Hearing

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

XENTEL, INC. and COURTESY HEALTH    :
WATCH, INC.,                        :       **Civ**
                            :

            Petitioners,    :     **VERIFIED PETITION TO**
                            :     **CONFIRM ARBITRATION AWARD**

      -against-               :

UNITED BREAST CANCER FOUNDATION,   :

           Respondent.    :
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Petitioners, Xentel, Inc. and Courtesy Health Watch, Inc. (hereinafter collectively

"Xentel"), by and through their undersigned counsel, respectfully allege the following in support

of their Verified Petition to Confirm Arbitration Award:

## INTRODUCTION

       1.     This Petition is brought pursuant to Section 9 of the Federal Arbitration Act, 9

U.S.C. § 9, to confirm and have judgment entered on an arbitration award dated March 29, 2011

(hereinafter the "Award").  A true and correct copy of the Award is attached hereto as **Exhibit 1**,

and incorporated herein by reference.

       2.     The Award was issued in an arbitration that was conducted before the American

Arbitration Association ("AAA") and that is captioned *Xentel, Inc./Courtesy Health Watch, Inc.*

*vs. United Breast Cancer Foundation*, AAA Case No. 13-193-00882-10.

       3.     No previous application for the relief sought herein has been made to this Court or

any other court.

7497945v.1

4.       Claimant Xentel and Respondent United Breast Cancer Foundation ("UBCF")
entered into an agreement dated August 22, 2005, pursuant to which Xentel was to provide
member recruiting and fundraising services to UBCF for a period of five (5) years for a series of
fundraising campaigns throughout the continental United States (the "Agreement"). A copy of
the Agreement, including Schedules A-D, is annexed hereto as **Exhibit 2**.

5.       The Agreement provides, at section 15 for arbitration, as follows:

15.00 ATTORNEY FEES AND BINDING ARBITRATION

15.01  In the event that there is any dispute concerning the terms
and conditions of this Agreement, the parties agree to submit to
binding arbitration pursuant to the rules of the American
Arbitration Association, and the prevailing party in any arbitration
shall be entitled to an award of reasonable attorney's fees and
costs. The place of arbitration shall in the counties of Suffolk,
Nassau or New York in the state of New York.

6.       On April 12, 2010, Xentel, pursuant to the aforesaid arbitration provision, filed
with the AAA a Demand for Arbitration against UBCF, requesting that New York City serve as
the locale for the arbitration and that the AAA Arbitration Rules apply.

7.       The Demand for Arbitration alleged in substance that UBCF had failed to make
payments to Xentel when due. A copy of the Demand for Arbitration, with exhibit, is attached as
**Exhibit 3**, and incorporated herein by reference.

8.       On June 16, 2010, UBCF filed an Answering Statement with Affirmative
Defenses and Counterclaim with the AAA, denying UBCF's allegations that Xentel had failed to
comply with the terms of the Agreement. The Counterclaim also sought damages from Xentel
for failure by Xentel to provide certain credits to UBCF. A copy of the Answering Statement
with Affirmative Defenses and Counterclaim is attached as **Exhibit 4,** and incorporated herein
by reference.

-2-

9.      In accordance with the AAA Rules and the Agreement, a one-person Panel (hereinafter "the Panel") was formed and accepted by the parties without objection. The Panel-member was Charles Moxley, Jr., Esq. A copy of the AAA Rules is attached as **Exhibit 5**, and incorporated by reference.

10.     Upon UBCF's repeated requests, proceedings were time and again postponed due to an injury suffered by UBCF's key witness, but finally a hearing was held over two days, on February 8 and 9, 2011, at the offices of Xentel's counsel in New York City, to which location counsel for UBCF consented. A total of five (5) witnesses testified during the hearing.

11.     Thereafter, the Panel issued the Interim Award on March 29, 2011, finding for Xentel and against UBCF on all claims. The Interim Award provides, in relevant part, as follows:

(1)     Within thirty days of the date of this Interim Award, Respondent United Breast Cancer Foundation shall pay Claimant Courtesy Health Watch, Inc. the sum of $112,976.71, along with pre-award interest in the amount of $35,461.45, for a total payment in the amount of ONE HUNDRED FORTY-EIGHT THOUSAND FOUR HUNDRED THIRTY-EIGHT DOLLARS AND SIXTEEN CENTS ($148,438.16).

(2)     Within thirty days of the date of this Award, Respondent United Breast Cancer Foundation shall further pay Claimant Courtesy Health Watch, Inc. the sum of THIRTY-FOUR THOUSAND TWO HUNDRED THIRTY-NINE DOLLARS AND NO CENTS ($34,239.00).

(3)     The counterclaims of Respondent United Breast Cancer Foundation are dismissed with prejudice.

(4)     It is hereby declared that Claimant Courtesy Health Watch, Inc. is the prevailing party in this arbitration and, as such, is entitled, under the Parties' above-referenced arbitration agreement, to an award of reasonable attorneys' fees and costs in this matter.

(5)     Pursuant to the previously-established schedule, Claimant Courtesy Health Watch, Inc, shall have two weeks from its receipt of this Interim Award to serve and file affidavits and exhibits as to its attorneys' fees and costs in this matter, following which Respondent United Breast Cancer Foundation shall have one week to serve and file opposing papers as to attorneys' fees and costs or to request that a hearing be scheduled as to such matters.

-3-

The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed. If briefs are to be filed, the hearing shall b e declared closed as of the final date set by the arbitrator for the receipt of briefs. If documents are to be filed as provided in Section R-32 and the date set for their receipt is later than that set for the receipt of briefs, the later date shall be the closing date of the hearing. The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing.

R-36. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed on by the parties in the contract(s) out of which the controversy has arisen, the matter may not be reopened unless the parties agree on an extension of time. When no specific date is fixed in the contract, the arbitrator may reopen the hearing and shall have 30 days from the closing of the reopened hearing within which to make an award.

R-37. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

R-38. Extensions of Time

The parties may modify any period of time by mutual agreement. The AAA or the arbitrator may for good cause extend any period of time established by these rules, except the time for making the award. The AAA shall notify the parties of any extension.

R-39. Serving of Notice

(a) Any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules, for any court action in connection therewith, or for the entry of judgment on any award made under these rules may be served on a party by mail addressed to the party, or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party.

(b) The AAA, the arbitrator and the parties may also use overnight delivery or electronic facsimile transmission (fax), to give the notices required by these rules. Where all parties and the arbitrator agree, notices may be transmitted by electronic mail (E-mail), or other methods of communication.

(c) Unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

R-40. Majority Decision

When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement, a majority of the arbitrators must make all decisions.

R-41. Time of Award

The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 days from the date of closing the hearing, or, if oral hearings have been waived, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator.

R-42. Form of Award

(a) Any award shall be in writing and signed by a majority of the arbitrators. It shall be executed in the manner required by law.

(b) The arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate.

R-43. Scope of Award

(a) The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.

(b) In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

(c) In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-49, R-50, and R-51. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

(d) The award of the arbitrator(s) may include:

(i) interest at such rate and from such date as the arbitrator(s) may deem appropriate; and

(ii) an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement.

R-44. Award upon Settlement

If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award." A consent award must include an allocation of arbitration costs, including administrative fees and expenses as well as arbitrator fees and expenses.

R-45. Delivery of Award to Parties

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at the last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

R-46. Modification of Award

Within 20 days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 days to respond to the request. The arbitrator shall dispose of the request within 20 days after transmittal by the AAA to the arbitrator of the request and any response thereto.

R-47. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party, furnish to the party, at the party's expense, certified copies of any papers in the AAA's possession that may be required in judicial proceedings relating to the arbitration.

R-48. Applications to Court and Exclusion of Liability

(a) No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

(b) Neither the AAA nor any arbitrator in a proceeding under these rules is a necessary or proper party in judicial proceedings relating to the arbitration.

(c) Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

(d) Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

R-49. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe an initial filing fee and a case service fee to compensate it for the cost of providing administrative services. The fees in effect when the fee or charge is incurred shall be applicable. The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

R-50. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

R-51. Neutral Arbitrator's Compensation

(a) Arbitrators shall be compensated at a rate consistent with the arbitrator's stated rate of compensation.

(b) If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

(c) Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

R-52. Deposits

The AAA may require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's fee, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case.

R-53. Interpretation and Application of Rules

The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

R-54. Suspension for Nonpayment

If arbitrator compensation or administrative charges have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment. If such payments are not made, the arbitrator may order the suspension or termination of the proceedings. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

EXPEDITED PROCEDURES

E-1. Limitation on Extensions

Except in extraordinary circumstances, the AAA or the arbitrator may grant a party no more than one seven-day extension of time to respond to the demand for arbitration or counterclaim as provided in Section R-4.

E-2. Changes of Claim or Counterclaim

A claim or counterclaim may be increased in amount, or a new or different claim or counterclaim added, upon the agreement of the other party, or the consent of the arbitrator. After the arbitrator is appointed, however, no new or different claim or counterclaim may be submitted except with the arbitrator's consent. If an increased claim or counterclaim exceeds $75,000, the case will be administered under the regular procedures unless all parties and the arbitrator agree that the case may continue to be processed under the Expedited Procedures.

E-3. Serving of Notices

In addition to notice provided by Section R-39(b), the parties shall also accept notice by telephone. Telephonic notices by the AAA shall subsequently be confirmed in writing to the parties. Should there be a failure to confirm in writing any such oral notice, the proceeding shall nevertheless be valid if notice has, in fact, been given by telephone.

E-4. Appointment and Qualifications of Arbitrator

(a) The AAA shall simultaneously submit to each party an identical list of five proposed arbitrators drawn from its National Roster from which one arbitrator shall be appointed.

(b) The parties are encouraged to agree to an arbitrator from this list and to advise the AAA of their agreement. If the parties are unable to agree upon an arbitrator, each party may strike two names from the list and return it to the AAA within seven days from the date of the AAA's mailing to the parties. If for any reason the appointment of an arbitrator cannot be made from the list, the AAA may make the appointment from other members of the panel without the submission of additional lists.

(c) The parties will be given notice by the AAA of the appointment of the arbitrator, who shall be subject to disqualification for the reasons specified in Section R-17. The parties shall notify the AAA within seven days of any objection to the arbitrator appointed. Any such objection shall be for cause and shall be confirmed in writing to the AAA with a copy to the other party or parties.

E-5. Exchange of Exhibits

At least two business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing. The arbitrator shall resolve disputes concerning the exchange of exhibits.

E-6. Proceedings on Documents

Where no party's claim exceeds $10,000, exclusive of interest and arbitration costs, and other cases in which the parties agree, the dispute shall be resolved by submission of documents, unless any party requests an oral hearing, or the arbitrator determines that an oral hearing is necessary. The arbitrator shall establish a fair and equitable procedure for the submission of documents.

### E-7. Date, Time, and Place of Hearing

In cases in which a hearing is to be held, the arbitrator shall set the date, time, and place of the hearing, to be scheduled to take place within 30 days of confirmation of the arbitrator's appointment. The AAA will notify the parties in advance of the hearing date.

### E-8. The Hearing

(a) Generally, the hearing shall not exceed one day. Each party shall have equal opportunity to submit its proofs and complete its case. The arbitrator shall determine the order of the hearing, and may require further submission of documents within two days after the hearing. For good cause shown, the arbitrator may schedule additional hearings within seven business days after the initial day of hearings.

(b) Generally, there will be no stenographic record. Any party desiring a stenographic record may arrange for one pursuant to the provisions of Section R-26.

### E-9. Time of Award

Unless otherwise agreed by the parties, the award shall be rendered not later than 14 days from the date of the closing of the hearing or, if oral hearings have been waived, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator.

### E-10. Arbitrator's Compensation

Arbitrators will receive compensation at a rate to be suggested by the AAA regional office.

### PROCEDURES FOR LARGE, COMPLEX COMMERCIAL DISPUTES

### L-1. Administrative Conference

Prior to the dissemination of a list of potential arbitrators, the AAA shall, unless the parties agree otherwise, conduct an administrative conference with the parties and/or their attorneys or other representatives by conference call. The conference will take place within 14 days after the commencement of the arbitration. In the event the parties are unable to agree on a mutually acceptable time for the conference, the AAA may contact the parties individually to discuss the issues contemplated herein. Such administrative conference shall be conducted for the following purposes and for such additional purposes as the parties or the AAA may deem appropriate:

(a) to obtain additional information about the nature and magnitude of the dispute and the anticipated length of hearing and scheduling;

(b) to discuss the views of the parties about the technical and other qualifications of the arbitrators;

(c) to obtain conflicts statements from the parties; and

(d) to consider, with the parties, whether mediation or other non-adjudicative methods of dispute resolution might be appropriate.

### L-2. Arbitrators

(a) Large, Complex Commercial Cases shall be heard and determined by either one or three arbitrators, as may be agreed upon by the parties. If the parties are unable to agree upon the number of arbitrators and a claim or counterclaim involves at least $1,000,000, then three arbitrator(s) shall hear and determine the case. If the parties are unable to agree on the number of arbitrators and each claim and counterclaim is less than $1,000,000, then one arbitrator shall hear and determine the case.

(b) The AAA shall appoint arbitrator(s) as agreed by the parties. If they are unable to agree on a method of appointment, the AAA shall appoint arbitrators from the Large, Complex Commercial Case Panel, in the manner provided in the Regular Commercial Arbitration Rules. Absent agreement of the parties, the arbitrator(s) shall not have served as the mediator in the mediation phase of the instant proceeding.

### L-3. Preliminary Hearing

As promptly as practicable after the selection of the arbitrator(s), a preliminary hearing shall be held among the parties and/or their attorneys or other representatives and the arbitrator(s). Unless the parties agree otherwise, the preliminary hearing will be conducted by telephone conference call rather than in person. At the preliminary hearing the matters to be considered shall include, without limitation:

(a) service of a detailed statement of claims, damages and defenses, a statement of the issues asserted by each party and positions with respect thereto, and any legal authorities the parties may wish to bring to the attention of the arbitrator(s);

(b) stipulations to uncontested facts;

(c) the extent to which discovery shall be conducted;

(d) exchange and premarking of those documents which each party believes may be offered at the hearing;

(e) the identification and availability of witnesses, including experts, and such matters with respect to witnesses including their biographies and expected testimony as may be appropriate;

(f) whether, and the extent to which, any sworn statements and/or depositions may be introduced;

(g) the extent to which hearings will proceed on consecutive days;

(h) whether a stenographic or other official record of the proceedings shall be maintained;

(i) the possibility of utilizing mediation or other non-adjudicative methods of dispute resolution; and

(j) the procedure for the issuance of subpoenas.

By agreement of the parties and/or order of the arbitrator(s), the pre-hearing activities and the hearing procedures that will govern the arbitration will be memorialized in a Scheduling and Procedure Order.

L-4. Management of Proceedings

(a) Arbitrator(s) shall take such steps as they may deem necessary or desirable to avoid delay and to achieve a just, speedy and cost-effective resolution of Large, Complex Commercial Cases.

(b) Parties shall cooperate in the exchange of documents, exhibits and information within such party's control if the arbitrator(s) consider such production to be consistent with the goal of achieving a just, speedy and cost-effective resolution of a Large, Complex Commercial Case.

(c) The parties may conduct such discovery as may be agreed to by all the parties provided, however, that the arbitrator(s) may place such limitations on the conduct of such discovery as the arbitrator(s) shall deem appropriate. If the parties cannot agree on production of documents and other information, the arbitrator(s), consistent with the expedited nature of arbitration, may establish the extent of the discovery.

(d) At the discretion of the arbitrator(s), upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator(s) may order depositions of, or the propounding of interrogatories to, such persons who may possess information determined by the arbitrator(s) to be necessary to determination of the matter.

(e) The parties shall exchange copies of all exhibits they intend to submit at the hearing 10 business days prior to the hearing unless the arbitrator(s) determine otherwise.

(f) The exchange of information pursuant to this rule, as agreed by the parties and/or directed by the arbitrator(s), shall be included within the Scheduling and Procedure Order.

(g) The arbitrator is authorized to resolve any disputes concerning the exchange of information.

(h) Generally hearings will be scheduled on consecutive days or in blocks of consecutive days in order to maximize efficiency and minimize costs.

OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION

O-1. Applicability

Where parties by special agreement or in their arbitration clause have adopted these rules for emergency measures of protection, a party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by facsimile transmission, or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.

O-2. Appointment of Emergency Arbitrator

Within one business day of receipt of notice as provided in Section O-1, the AAA shall appoint a single emergency arbitrator from a special AAA panel of emergency arbitrators designated to rule on emergency applications. The emergency arbitrator shall immediately disclose any circumstance likely, on the basis of the facts disclosed in the application, to affect such arbitrator's impartiality or

independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the AAA to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.

O-3. Schedule

The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceeding by telephone conference or on written submissions as alternatives to a formal hearing.

O-4. Interim Award

If after consideration the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief, and that such party is entitled to such relief, the emergency arbitrator may enter an interim award granting the relief and stating the reasons therefore.

O-5. Constitution of the Panel

Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator until the panel is constituted; thereafter such a request shall be addressed to the panel. The emergency arbitrator shall have no further power to act after the panel is constituted unless the parties agree that the emergency arbitrator is named as a member of the panel.

O-6. Security

Any interim award of emergency relief may be conditioned on provision by the party seeking such relief of appropriate security.

O-7. Special Master

A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate. If the AAA is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the AAA shall proceed as provided in Section O-1 of this article and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.

O-8. Costs

The costs associated with applications for emergency relief shall initially be apportioned by the emergency arbitrator or special master, subject to the power of the panel to determine finally the apportionment of such costs.

Administrative Fee Schedules (Standard and Flexible Fee)

The AAA has two administrative fee options for parties filing claims or counterclaims, the Standard Fee Schedule and Flexible Fee Schedule. The Standard Fee Schedule has a two payment schedule, and the Flexible Fee Schedule has a three payment schedule which offers lower initial filing fees, but potentially higher total administrative fees of approximately 12% to 19% for cases that proceed to a hearing. The administrative fees of the AAA are based on the amount of the claim or counterclaim. Arbitrator compensation is not included in this schedule. Unless the parties agree otherwise, arbitrator compensation and administrative fees are subject to allocation by the arbitrator in the award.

In an effort to make arbitration costs reasonable for consumers, the AAA has a separate fee schedule for consumer-related disputes. Please refer to Section C-8 of the Supplementary Procedures for Consumer-Related Disputes when filing a consumer-related claim. Note that the Flexible Fee Schedule is not available on cases administered under these supplementary procedures.

The AAA applies the Supplementary Procedures for Consumer-Related Disputes to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

Fees for incomplete or deficient filings: Where the applicable arbitration agreement does not reference the AAA, the AAA will attempt to obtain the agreement of the other parties to the dispute to have the arbitration administered by the AAA. However, where the AAA is unable to obtain the agreement of the parties to have the AAA administer the arbitration, the AAA will administratively close the case and will not proceed with the administration of the arbitration. In these cases, the AAA will return the filing fees to the filing party, less the amount specified in the fee schedule below for deficient filings.

Parties that file demands for arbitration that are incomplete or otherwise do not meet the filing requirements contained in these Rules shall also be charged the amount specified below for deficient filings if they fail or are unable to respond to the AAA's request to correct the deficiency.

Fees for additional services: The AAA reserves the right to assess additional administrative fees for services performed by the AAA beyond those provided for in these Rules which may be required by the parties' agreement or stipulation.

## Standard Fee Schedule

An Initial Filing Fee is payable in full by a filing party when a claim, counterclaim, or additional claim is filed. A Final Fee will be incurred for all cases that proceed to their first hearing. This fee will be payable in advance at the time that the first hearing is scheduled. This fee will be refunded at the conclusion of the case if no hearings have occurred. However, if the Association is not notified at least 24 hours before the time of the scheduled hearing, the Final Fee will remain due and will not be refunded.

These fees will be billed in accordance with the following schedule:

| Amount of Claim | Initial Filing Fee | Final Fee |
|---|---|---|
| Above $0 to $10,000 | $775 | $200 |
| Above $10,000 to $75,000 | $975 | $300 |
| Above $75,000 to $150,000 | $1,850 | $750 |
| Above $150,000 to $300,000 | $2,800 | $1,250 |
| Above $300,000 to $500,000 | $4,350 | $1,750 |
| Above $500,000 to $1,000,000 | $6,200 | $2,500 |
| Above $1,000,000 to $5,000,000 | $8,200 | $3,250 |
| Above $5,000,000 to $10,000,000 | $10,200 | $4,000 |
| Above $10,000,000 | Base fee of $12,800 plus .01% of the amount above $10,000,000<br><br>Fee Capped at $65,000 | $6,000 |
| Nonmonetary Claims[1] | $3,350 | $1,250 |

| | | |
|---|---|---|
| Deficient Claim Filing Fee[2] | $350 | |
| Additional Services[3] | | |

*1 This fee is applicable when a claim or counterclaim is not for a monetary amount. Where a monetary claim amount is not known, parties will be required to state a range of claims or be subject to a filing fee of $10,200.*

[2] *The Deficient Claim Filing Fee shall not be charged in cases filed by a consumer in an arbitration governed by the Supplementary Procedures for the Resolution of Consumer-Related Disputes, or in cases filed by an Employee who is submitting their dispute to arbitration pursuant to an employer promulgated plan.*

[3] *The AAA may assess additional fees where procedures or services outside the Rules sections are required under the parties' agreement or by stipulation.*

Fees are subject to increase if the amount of a claim or counterclaim is modified after the initial filing date. Fees are subject to decrease if the amount of a claim or counterclaim is modified before the first hearing.

The minimum fees for any case having three or more arbitrators are $2,800 for the Initial Filing Fee, plus a $1,250 Final Fee. Expedited Procedures are applied in any case where no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration costs.

Parties on cases filed under either the Flexible Fee Schedule or the Standard Fee Schedule that are held in abeyance for one year will be assessed an annual abeyance fee of $300. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be administratively closed.

*For more information, please contact your local AAA office, case management center, or our Customer Service desk at 1-800-778-7879.*

Refund Schedule for Standard Fee Schedule

The AAA offers a refund schedule on filing fees connected with the Standard Fee Schedule. For cases with claims up to $75,000, a minimum filing fee of $350 will not be refunded. For all other cases, a minimum fee of $600 will not be refunded. Subject to the minimum fee requirements, refunds will be calculated as follows:

> 100% of the filing fee, above the minimum fee, will be refunded if the case is settled or withdrawn within five calendar days of filing.

> 50% of the filing fee, will be refunded if the case is settled or withdrawn between six and 30 calendar days of filing.

> 25% of the filing fee will be refunded if the case is settled or withdrawn between 31 and 60 calendar days of filing.

No refund will be made once an arbitrator has been appointed (this includes one arbitrator on a three-arbitrator panel). No refunds will be granted on awarded cases.

Note: The date of receipt of the demand for arbitration with the AAA will be used to calculate refunds of filing fees for both claims and counterclaims.

## Flexible Fee Schedule

A non-refundable Initial Filing Fee is payable in full by a filing party when a claim, counterclaim, or additional claim is filed. Upon receipt of the Demand for Arbitration, the AAA will promptly initiate the case and notify all parties as well as establish the due date for filing of an Answer, which may include a Counterclaim. In order to proceed with the further administration of the arbitration and appointment of the arbitrator(s), the appropriate, non-refundable Proceed Fee outlined below must be paid.

If a Proceed Fee is not submitted within ninety (90) days of the filing of the Claimant's Demand for Arbitration, the Association will administratively close the file and notify all parties.

*No refunds or refund schedule will apply to the Filing or Proceed Fees once received.*

The Flexible Fee Schedule below also may be utilized for the filing of counterclaims. However, as with the Claimant's claim, the counterclaim will not be presented to the arbitrator until the Proceed Fee is paid.

A Final Fee will be incurred for all claims and/or counterclaims that proceed to their first hearing. This fee will be payable in advance when the first hearing is scheduled, but will be refunded at the conclusion of the case if no hearings have occurred. However, if the Association is not notified of a cancellation at least 24 hours before the time of the scheduled hearing, the Final Fee will remain due and will not be refunded.

All fees will be billed in accordance with the following schedule:

| Amount of Claim | Initial Filing Fee | Proceed Fee | Final Fee |
|---|---|---|---|
| Above $0 to $10,000 | $400 | $475 | $200 |
| Above $10,000 to $75,000 | $625 | $500 | $300 |
| Above $75,000 to $150,000 | $850 | $1250 | $750 |
| Above $150,000 to $300,000 | $1,000 | $2125 | $1,250 |
| Above $300,000 to $500,000 | $1,500 | $3,400 | $1,750 |
| Above $500,000 to $1,000,000 | $2,500 | $4,500 | $2,500 |
| Above $1,000,000 to $5,000,000 | $2,500 | $6,700 | $3,250 |
| Above $5,000,000 to $10,000,000 | $3,500 | $8,200 | $4,000 |
| Above $10,000,000 | $4,500 | $10,300 plus .01% of claim amount over $10,000,000 up to $65,000 | $6,000 |
| Nonmonetary[1] | $2,000 | $2,000 | $1,250 |

| Deficient Claim Filing Fee | $350 | | |
|---|---|---|---|
| Additional Services[2] | | | |

*1 This fee is applicable when a claim or counterclaim is not for a monetary amount. Where a monetary claim amount is not known, parties will be required to state a range of claims or be subject to a filing fee of $3,500 and a proceed fee of $8,200.*

*[2] The AAA reserves the right to assess additional administrative fees for services performed by the AAA beyond those provided for in these Rules and which may be required by the parties' agreement or stipulation.*

For more information, please contact your local AAA office, case management center, or our Customer Service desk at 1-800-778-7879 . All fees are subject to increase if the amount of a claim or counterclaim is modified after the initial filing date. Fees are subject to decrease if the amount of a claim or counterclaim is modified before the first hearing.

The minimum fees for any case having three or more arbitrators are $1,000 for the Initial Filing Fee; $2,125 for the Proceed Fee; and $1,250 for the Final Fee.

Under the Flexible Fee Schedule, a party's obligation to pay the Proceed Fee shall remain in effect regardless of any agreement of the parties to stay, postpone or otherwise modify the arbitration proceedings. Parties that, through mutual agreement, have held their case in abeyance for one year will be assessed an annual abeyance fee of $300. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be closed.

Note: The date of receipt by the AAA of the demand for arbitration will be used to calculate the ninety (90) day time limit for payment of the Proceed Fee.

There is no Refund Schedule in the Flexible Fee Schedule.

## Hearing Room Rental

The fees described above do not cover the cost of hearing rooms, which are available on a rental basis. Check with the AAA for availability and rates.

© 2010 American Arbitration Association, Inc. All rights reserved. These rules are the copyrighted property of the American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services. Any unauthorized use or modification of these rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.

AAA235

**FILE A CASE**     **CONTACT US**

- AAA MISSION & PRINCIPLES
- PRIVACY POLICY
- TERMS OF USE
- TECHNICAL RECOMMENDATIONS

- ©2007 AMERICAN ARBITRATION ASSOCIATION. ALL RIGHTS RESERVED